IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LEO PHARMA A/S, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 10-269 (SLR) |
| | ) | (consolidated) |
| TOLMAR, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### LEO PHARMA'S ANSWERING POST-TRIAL BRIEF CONCERNING THE VALIDITY OF U.S. PATENT NO. RE 39,706

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com

*Attorneys for Plaintiff LEO Pharma A/S*

OF COUNSEL:

William E. Solander
Bruce C. Haas
FITZPATRICK, CELLA, HARPER & SCINTO
1290 Avenue of the Americas
New York, NY  10104
(212) 218-2100

August 20, 2012

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... iv

I.      INTRODUCTION ...........................................................................1

II.     STATEMENT OF FACTS ...............................................................3

        A.      The Calcipotriol Monohydrate Disclosed in the Larsen  Publication
                Was Invented by the '706 Patent Inventors ...................................3

                1.      Calcipotriol Anhydrate Was Invented, Developed,  and
                        Patented at LEO Pharma in the 1980s ........................................3

                2.      At LEO Pharma's Request, Prof. Larsen Conducted
                        Ultimately Unsuccessful X-Ray Diffraction Experiments
                        on Calcipotriol Anhydrate to Determine the Absolute
                        Chemical Configuration of the Calcipotriol Molecule's
                        Side Chain.....................................................................................5

                3.      Erik Hansen First Crystallized Calcipotriol Monohydrate
                        in 1991 While Attempting to Make Calcipotriol  Anhydrate
                        Crystals Suitable for X-Ray Analysis ........................................6

                4.      '706 Patent Inventor Niels Andersen Gave  Co-Inventor
                        Erik Hansen's Calcipotriol Monohydrate  Crystals to Prof.
                        Larsen for X-Ray Analysis .........................................................7

                5.      The Larsen Publication Discloses the '706 Patent  Inventors'
                        Calcipotriol Monohydrate and Prof. Larsen's
                        Determination of Its Inherent Chemical and Crystalline
                        Structure ........................................................................................8

        B.      The '706 Patent Inventors Filed a Priority Patent Application
                Disclosing Calcipotriol Monohydrate Before the Larsen
                Publication Was Published .............................................................9

                1.      The '706 Patent .............................................................................9

                2.      Calcipotriol Monohydrate Was Fully Disclosed and
                        Described in the 1993 GB Priority Application..........................10

        C.      Calcipotriol Monohydrate Was Not the Subject of  A Commercial
                Offer for Sale Prior to January 7, 1993....................................11

                1.      LEO Pharma and BMS Had an Agreement to  Jointly
                        Research and Develop Calcipotriol Products ...........................12

2.      LEO Pharma Shipped Calcipotriol Gel Formulations to
BMS on June 15, 1992 for Experimental Purposes ................................... 14

3.      Needle-Shaped Crystals Were Sometimes Observed in
Calcipotriol Gel, But They Were Never Shown to Be
Calcipotriol Monohydrate ......................................................................... 16

4.      LEO Pharma Did Not Offer Calcipotriol Monohydrate-
Containing Gel Products for Sale Prior to January 7, 1993 ...................... 18

III.   ARGUMENT ........................................................................................................ 18

A.     Claim 1 of the '706 Patent Is Not Anticipated by the Larsen
Publication under 35 U.S.C. § 102(a) ................................................................ 18

1.      The Larsen Publication Is Not § 102(a) Prior Art to
the '706 Patent Because It Discloses the Inventors' Own
Work .......................................................................................................... 19

a.      The '706 Patent Inventors' Own Work Cannot Be
Used Against Them As Prior Art Under 35 U.S.C.
§ 102(a) ......................................................................................... 19

b.      The Larsen Publication Discloses the '706 Patent
Inventors' Own Work Because They Invented the
Calcipotriol Monohydrate Disclosed in the
Publication ..................................................................................... 20

2.      The Larsen Publication Is Not § 102(a) Prior Art Because It
Was Published after the '706 Patent's January 15, 1993
Priority Date .............................................................................................. 25

a.      The '706 Patent is Entitled to a January 15, 1993
Priority Date So Long As the GB 1993
Application Adequately Describes the Invention .......................... 25

b.      The Later Disclosure of Calcipotriol
Monohydrate's Inherent Storage Stability Does
Not Deprive the '706 Patent of Its 1993 Priority
Date ............................................................................................... 27

c.      The Recitation of Calcipotriol Monohydrate's
Inherent Storage Stability in Claim 1 Does Not
Deprive the '706 Patent of Priority ............................................... 28

d.      There Is No Legal Basis for Tolmar's Purported
"Immaterial to Patentability" Limitation on
Inherent Disclosure ....................................................................... 30

e.    The Facts Here Mirror *Silvestri v. Grant*, Not *Hitzeman* ...................................................................34

B.    The '706 Patent is Not Invalid Under 35 U.S.C. § 102(b) Because Calcipotriol Monohydrate Was Not the Subject of a Commercial Offer for Sale Before January 7, 1993 ...................................35

1.    There is No Evidence that the Gel Samples Shipped to BMS on June 15, 1992 Contained Calcipotriol Monohydrate .....................................................................36

a.    There is No Evidence that the Gel Shipped to BMS on June 15, 1992 Contained Needle-Shaped Crystals ...................................................37

b.    There is No Evidence That Any Needle-Shaped Crystals Ever Observed in LEO Pharma's Gel Product Were Calcipotriol Monohydrate...................38

2.    The June 15, 1992 Shipment Was Not a Commercial Offer for Sale of a Calcipotriol Monohydrate-Containing Product...................40

a.    The LEO-BMS Agreement Does Not Cover Calcipotriol Monohydrate-Containing Products...........................41

b.    The Gel Product Shipped to BMS on June 15, 1992 Was Shipped for Experimental Purposes Pursuant to the Development Portions of the Agreement...................................................43

c.    The Licensing Provisions of the LEO-BMS Agreement Are Also Not a Commercial Offer for Sale of Calcipotriol Monohydrate...................46

3.    The Invention Was Not Ready For Patenting Before the Critical Date .....................................................................47

C.    Claims 2 and 12 Would Not Have Been Obvious to a Person of Ordinary Skill in the Art ...................................................48

IV.    CONCLUSION...................................................................51

## TABLE OF AUTHORITIES

**Cases**

*Atlas Powder Co. v. Ireco Inc.*,
190 F.3d 1342 (Fed. Cir. 1999) ............................................................................. 23

*City of Elizabeth v. Am. Nicholson Pavement Co.*,
97 U.S. 126 (1877) ................................................................................................ 44

*Continental Can Co., USA v. Monsanto Co.*,
948 F.2d 1264 (Fed. Cir. 1991) ....................................................................... 33, 45

*Enzo Biochem, Inc. v. Gen-Probe, Inc.*,
424 F.3d 1276 (Fed. Cir. 2005) ....................................................................... 45, 46

*Hewlett-Packard Co. v. Bausch & Lomb Inc.*,
909 F.2d 1464 (Fed. Cir. 1990) ............................................................................... 3

*Hitzeman v. Rutter*, 243 F.3d 1352 (Fed. Cir. 2001) ................................. 32, 33, 34, 35

*In re Costello*,
717 F.2d 1346 (Fed. Cir. 1983) ............................................................................. 21

*In re DeBaun*,
687 F.2d 459 (C.C.P.A. 1982) ..................................................................... 20, 21, 23

*In re Edwards*,
568 F.2d 1349 (C.C.P.A. 1978) ..................................................................... 27, 31, 32

*In re Gosteli*,
872 F.2d 1008 (Fed. Cir. 1989) ..................................................................... 25, 26, 28

*In re Katz*,
687 F.2d 450 (C.C.P.A. 1982) ....................................................................... passim

*In re Kollar*,
286 F.3d 1326 (Fed. Cir. 2002) ............................................................................. 46

*In re Mathews*,
408 F.2d 1393 (C.C.P.A. 1969) ....................................................................... 21, 23

*In re Mulder*,
716 F.2d 1542 (Fed. Cir. 1983) ............................................................................. 33

*In re Nathan*,
328 F.2d 1005 (C.C.P.A. 1964) ..................................................................... 27, 30, 31

*In re Reynolds,*
  443 F.2d 384 (C.C.P.A. 1971) ............................................................. 27, 28, 29, 34

*In re Ruschig,*
  343 F.2d 965 n.8 (C.C.P.A. 1965) .................................................................... 34

*Kennecott Corp. v. Kyocera Int'l, Inc.,*
  835 F.2d 1419 (Fed. Cir. 1987) .............................................................. 27, 29, 34

*Keystone Retaining Wall Sys. V. Westrock, Inc.,*
  997 F.2d 1444 (Fed. Cir. 1993) ....................................................................... 43

*Kimberly-Clark Corp. v. Fort Howard Paper Co.,*
  772 F.2d 860 (Fed. Cir. 1985) ......................................................................... 33

*Lacks Indus., Inc. v. McKechnie Vehicle Components USA, Inc.,*
  322 F.3d 1335 (Fed. Cir. 2003) ....................................................................... 19

*Laryngeal Mask Co. v. Ambu A/S,*
  618 F.3d 1367 (Fed. Cir. 2010) ....................................................................... 26

*Licensing Corp. v. Videotek, Inc.,*
  545 F.3d 1316 (Fed. Cir. 2008) ....................................................................... 26

*Mannesman Demag Corp. v. Engineered Metal Prods. Co.,*
  226 U.S.P.Q. 466 (D. Del. 1985) ................................................................. 24, 25

*Mas-Hamilton Group v. LaGard, Inc.,*
  156 F.3d 1206 (Fed. Cir. 1998) ....................................................................... 46

*Microsoft Corp. v. i4i Ltd. P'ship,*
  131 S. Ct. 2238 (2011) ................................................................................. 2, 18

*Minton v. Nat'l Assn. of Sec. Dealers, Inc.,*
  336 F.3d 1373 (Fed. Cir. 2003) ............................................................... 35, 36, 37

*Novo-Nordisk A/S v. Becton Dickinson & Co.,*
  96 F. Supp. 2d 309 (S.D.N.Y. 2000) ................................................................. 28

*Panduit Corp. v. Dennison Mfg. Co.,*
  810 F.2d 1561 (Fed. Cir. 1987) ....................................................................... 18

*Pfaff v. Wells,*
  525 U.S. 55 n.2 (1998) ............................................................................. passim

*Riverwood Int'l Corp v. R.A. Jones & Co.,*
  324 F.3d 1346 (Fed. Cir. 2003) ............................................................. 19, 21, 22

*Schering Corp. v. Geneva Pharms., Inc.*,
    339 F.3d 1373 (Fed. Cir. 2003) ............................................................. 33

*Silvestri v. Grant*,
    496 F.2d 593 (C.C.P.A. 1974) ......................................................... 34, 35

*South Corp. v. United States*,
    690 F.2d 1368 (Fed. Cir. 1982) ............................................................. 34

*Sparton Corp. v. United States*,
    399 F.3d 1321 (Fed. Cir. 2005) ....................................................... 42, 43

*Sundance, Inc. v. DeMonte Fabricating Ltd.*,
    550 F.3d 1356 (Fed. Cir. 2008) ............................................................. 50

*Tec Air, Inc. v. Denso Mfr. Mich. Inc.*,
    192 F.3d 1353 (Fed. Cir. 1999) ....................................................... 41, 43

*Therma-Tru Corp. v. Peachtree Doors Inc.*,
    44 F.3d 988 (Fed. Cir. 1995) ................................................................ 27

## Statutes

35 U.S.C. § 102(a) ................................................................... passim

35 U.S.C. § 102(b) ................................................................... passim

35 U.S.C. § 103 ............................................................ 2, 48, 49, 51

35 U.S.C. § 112 ........................................................... 26, 29, 31, 33

35 U.S.C. § 119 ........................................................... 25, 26, 27, 33

35 U.S.C. § 120 .............................................................................. 27

35 U.S.C. § 282 ................................................................................ 2

## Rules

Fed. R. Evid. 702 ........................................................................... 50

## I.    <u>INTRODUCTION</u>

In its opening brief purportedly limited to validity issues, Tolmar devotes the first four

pages to, among other things, discussion of: a Rule 11 motion that was never filed; Tolmar's

cream product, which is no longer at issue in this case and which Tolmar has been free to market

since FDA approval was obtained; a reexamination proceeding to which Tolmar is not a party

concerning a patent not in suit; a theory not advanced at trial and never advanced with respect to

Tolmar's accused ointment product concerning Teva's supply of the active ingredient (API) in

that product; and a patent not considered at trial because this Court bifurcated and stayed that

portion of the case.  (*See* Tolmar's Post-Trial Opening Brief ("Tolmar Br.") at 1-4.)  None of

those subjects have anything to do with the validity (or infringement) of U.S. Patent No. RE

39,706 ("the '706 patent").  That Tolmar chose to lead with those irrelevant subjects underscores

the weakness of its invalidity case.

In finally turning to its invalidity contentions, Tolmar alleges in error that a publication

co-authored by the three '706 patent inventors and Prof. Sine Larsen of Copenhagen University

("the Larsen Publication") anticipates Claim 1 of the '706 patent under 35 U.S.C. § 102(a).  (*See*

DTX 9.)  The Larsen Publication is not § 102(a) prior art for two reasons.  First, the allegedly

anticipating subject matter in the Larsen Publication, the description of calcipotriol monohydrate

and the method of making it, was contributed by the three '706 patent inventors.  The Larsen

Publication cannot be anticipatory because an inventor's own work published less than one year

before the patent covering that work was filed in the United States cannot invalidate the patent.

*See In re Katz*, 687 F.2d 450, 454 (C.C.P.A. 1982).  Second, the Larsen Publication was

published after the inventors filed a priority patent application in Great Britain that describes

calcipotriol monohydrate and provides a method for making it.  (*See* JTX 11.)  Thus, even if the

Larsen Publication did not describe the inventors' own work, it cannot anticipate the '706 patent because it is antedated by the inventors' priority patent application.

Tolmar's second invalidity contention is that Claims 1 and 2 are anticipated under 35 U.S.C. § 102(b) because more than one year before its U.S. patent application was filed, LEO Pharma allegedly sold a product containing calcipotriol monohydrate to Bristol-Myers Squibb ("BMS"), its research and development collaborator at the time. This is legally and factually incorrect. First, there is no evidence (such as actual test data), let alone clear and convincing evidence, that any product shipped to BMS before LEO Pharma's U.S. patent application was filed contained calcipotriol monohydrate. Tolmar's contentions to the contrary rest entirely on the uncorroborated speculation of a single LEO Pharma scientist. Second, LEO Pharma and BMS's agreement under which samples were provided covered only products containing calcipotriol anhydrate, not calcipotriol monohydrate. Third, even if the product LEO Pharma sent to BMS did contain calcipotriol monohydrate, that product was never "sold" as required by Section 102(b). Finally, no pharmaceutical composition containing calcipotriol monohydrate was "ready for patenting" one year before LEO Pharma's U.S. patent application was filed.

Tolmar also contends that Claims 2 and 12 of the '706 patent are obvious under 35 U.S.C. § 103 in view of the Larsen Publication and/or the calcipotriol gel product that was allegedly "on sale." However, Tolmar has presented no evidence, offering only attorney argument, that the subject matter of these claims would have been obvious to a person of ordinary skill in the art.

The '706 patent is presumed valid and Tolmar bears the heavy burden of establishing invalidity by clear and convincing evidence. 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242, 46 (2011). That burden is particularly difficult to overcome where, as

here, the patent in suit was reissued following examination, and the alleged prior art on which the patent challenger relies was before the patent examiner. *See Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467 (Fed. Cir. 1990). Tolmar cannot meet that burden in this case.

## II.   STATEMENT OF FACTS

### A.   The Calcipotriol Monohydrate Disclosed in the Larsen Publication Was Invented by the '706 Patent Inventors

As explained in detail below, and as confirmed by contemporaneous documents in evidence, calcipotriol monohydrate was discovered at LEO Pharma by the '706 patent inventors. That discovery is recounted in the Larsen Publication, of which the three inventors are co-authors. Professor Larsen's contribution to that article was a single crystal x-ray analysis that is nowhere reported in the '706 patent, and which merely confirmed the inventors' prior discovery of the monohydrate form of calcipotriol.

#### 1.   Calcipotriol Anhydrate Was Invented, Developed, and Patented at LEO Pharma in the 1980s

Calcipotriol is a vitamin D derivative discovered at LEO Pharma in 1984 by Dr. Martin Calverley. (Tr. 40:6-42:24.) It was discovered as part of an effort in which Dr. Calverley and his fellow chemists synthesized over 1,000 compounds in an attempt to find one that had the beneficial effect of controlling the hyperproliferation of cells (such as skin cells), with no negative effect on calcium regulation in the body. (*Id.*) As depicted below, the calcipotriol molecule is comprised of a secosteroid "backbone" and a "side chain." (Pretrial Order ("PTO") Exhibit 1 p. 2.)



At first, Dr. Calverley synthesized calcipotriol in an amorphous (non-crystalline) form, but because it was not crystalline, it was considered unsuitable for development as a pharmaceutical product.  (Tr. 42:25-43:13.)  Dr. Calverley eventually was able to make calcipotriol in an anhydrous crystalline form, which would later become known as "calcipotriol anhydrate."  (Tr. 43:14-17.)  Calcipotriol anhydrate was developed as a pharmaceutical product for the treatment of psoriasis and was first marketed by LEO Pharma in Europe in 1991.  (Tr. 44:1-6.)  Calcipotriol anhydrate is still used today in a product sold by LEO Pharma.  (Tr. 46:21-24.)

Dr. Calverley obtained a U.S. patent on his discovery in 1989.  (DTX 2, "the Calverley patent.")  The Calverley patent discloses the calcipotriol molecule, but does not disclose or suggest the existence of a monohydrate form of calcipotriol.  (*See* DTX 2 Compound 59, Example 5.)  The patent also discloses pharmaceutical compositions containing calcipotriol, but contains no information about whether those compositions would be compatible with a monohydrate form of calcipotriol.  (*See* DTX 2 at Examples 20-21.)

**2.     At LEO Pharma's Request, Prof. Larsen Conducted
Ultimately Unsuccessful X-Ray Diffraction Experiments
on Calcipotriol Anhydrate to Determine the Absolute Chemical
Configuration of the Calcipotriol Molecule's Side Chain**

Although LEO Pharma was preparing to market a product containing calcipotriol

anhydrate in 1991, the stereochemical configuration of the side chain of the calcipotriol molecule

had not been conclusively proven at that time.  (Tr. 92:16-94:12.)  Specifically, the orientation of

the 24-hydroxy group was uncertain; that group could be oriented above the plane of the

molecule, or below it (as represented by the squiggly line in the picture below).  (Tr. 93:6-11.)



This uncertainty posed a potential problem for LEO Pharma because the FDA requires

New Drug Applications (NDAs) to include proof of the chemical structure of the active

molecule.  (Tr. 92:25-93:5.)  Dr. Calverley had performed some chemical experiments and had

proposed one particular orientation of the 24-hydroxy group, but LEO Pharma wanted to provide

complete and accurate information to the FDA.  (Tr. 93:6-18; DTX 28 at LEOP0332504-06.)

Specifically, LEO Pharma wanted to prove the absolute chemical configuration of the

calcipotriol molecule, including the orientation of the 24-hydroxy group in the side chain, by

performing single crystal x-ray diffraction experiments.  (*Id.*)  However, LEO Pharma did not

have the facilities and equipment necessary to perform such an experiment in house.  (Tr. 94:20-

24.)  LEO Pharma therefore asked Professor Sine Larsen of the University of Copenhagen to

perform this work to enable LEO Pharma to provide information about the orientation of the 24-hydroxy group to the FDA.  (Tr. 93:12-18.)  Niels Rastrup Andersen, a spectroscopist at LEO Pharma and one of the '706 patent inventors, was the primary contact with Prof. Larsen.  (*See* Tr. 642:17-643:6; DTX 10.)  Over the years, LEO Pharma sent various batches of calcipotriol anhydrate to Prof. Larsen for x-ray analysis but the anhydrate crystals produced according to the usual crystallization techniques were not large enough for use in x-ray diffraction experiments. (DTX 28 at LEOP0332504-06; Tr. 114:7-10.)

### 3. Erik Hansen First Crystallized Calcipotriol Monohydrate in 1991 While Attempting to Make Calcipotriol Anhydrate Crystals Suitable for X-Ray Analysis

In 1991, Andersen turned to Erik Hansen, a process development chemist at LEO Pharma and also one of the '706 patent inventors, for assistance with producing crystals suitable for Prof. Larsen's x-ray diffraction analysis.  (*See* Tr. 111:3-112:22, 114:1-14.)  Andersen asked Hansen to experiment with different crystallization conditions to try to make larger calcipotriol anhydrate crystals that might be suitable for x-ray analysis.  (Tr. 114:1-20.)  On February 26, 1991, Hansen performed an experiment entitled "ETH 2164" in which he dissolved solid calcipotriol anhydrate crystals in water saturated ethyl acetate and then recrystallized the calcipotriol (*i.e.*, produced solid crystals once again).  (PTX 98 at LEOP0225944; Tr. 114:1-116:25.)  On the next day, February 27, 1991, he obtained crystals that were larger than the calcipotriol anhydrate crystals LEO Pharma usually produced.  (Tr. 116:17-117:6.)  At the time, Hansen thought that he had simply produced larger crystals of calcipotriol anhydrate.  (Tr. 115:6-13.)

As requested, Hansen gave some of the ETH 2164 crystals to Andersen.  (Tr. 117:1-6, 123:2-5, 126:13-16.)  Andersen and Lene Hoffmeyer, another LEO Pharma spectroscopist and '706 patent inventor, analyzed a sample of Hansen's crystals.  (Tr. 129:14-24; 135:15-136:5.) Among the techniques they used to analyze the sample were infrared (IR) spectroscopy and

differential scanning calorimetry (DSC), two of the methods for identifying calcipotriol monohydrate disclosed in the '706 patent.  (PTX 104; Tr. 129:14-130:12.)  Hoffmeyer memorialized the results of this testing in a report dated March 22, 1991.  (PTX 104; Tr. 129:14-135:14.)  Based on the IR spectroscopy and DSC results contained in the report, Hoffmeyer and Andersen concluded that the ETH 2164 crystals were a previously unknown monohydrate crystal form of calcipotriol.  (PTX 104 at LEOP0257781-82; Tr. 132:18-133:12.)  The results of these tests were later reported in the '706 patent.  (Tr. 129:14-130:9; JTX 1; PTX 100, 104.)[1] Andersen and Hoffmeyer informed Hansen that the crystals he produced were a previously unknown calcipotriol monohydrate crystalline form.  (Tr. 117:7-12.)

### 4.   '706 Patent Inventor Niels Andersen Gave Co-Inventor Erik Hansen's Calcipotriol Monohydrate Crystals to Prof. Larsen for X-Ray Analysis

Although calcipotriol monohydrate and calcipotriol anhydrate differ in their ***crystalline*** structures (for example, the monohydrate form incorporates a water molecule into the crystal structure whereas the anhydrate form does not), the ***chemical*** structure of the underlying calcipotriol molecule is the same in both forms.  (*See* Tr. 47:16-48:1, 315:3-12.)  Consequently, Niels Andersen believed that Prof. Larsen might be able to use these larger ***monohydrate*** crystals to determine the absolute chemical configuration of the calcipotriol molecule's side-chain for inclusion in the registration files for LEO Pharma's calcipotriol ***anhydrate*** products.  (Tr. 92:16-94:24; DTX 28 at LEOP0332504-06; *see* DTX 9 at 619; PTX 74.)

On April 5, 1991, Andersen sent a 10 mg sample of calcipotriol monohydrate crystals from Erik Hansen's ETH 2164 batch to Prof. Larsen for x-ray analysis.  (PTX 74; Tr. 126:13-16,

---

[1] Due to a typographical error or an error in reading the IR spectrum, the '706 patent specification incorrectly identifies an IR line for calcipotriol monohydrate at 573 cm$^{-1}$ instead of 583 cm$^{-1}$.  (Tr. 141:9-18.)  The remaining lines, however, are sufficient to permit unambiguous identification of calcipotriol monohydrate.  (Tr. 144:7-12.)

137:15-138:11, 148:18-149:6, 641:20-643:6.)  With the sample, Andersen also sent a letter to

Prof. Larsen describing the sample.  (*Id.*)  In the letter, Andersen explained that the sample of

batch ETH 2164 was "another crystal form than that we usually make" and that the crystals were

"much bigger than the ones you have seen before."  (PTX 74; Tr. 641:20-643:6.)  He also

informed Prof. Larsen that "[t]he compound contains 1 mole of water, likely bound in the

crystals," indicating that what was being sent was a monohydrate form of calcipotriol.  (PTX 74;

Tr. 139:2-7.)  Prof. Larsen was under an ongoing obligation to keep this work confidential.  (Tr.

138:16-18.)

The calcipotriol monohydrate crystals that Erik Hansen produced and Niels Andersen

provided to Professor Larsen were indeed suitable for Prof. Larsen's x-ray diffraction analysis

and she was able to confirm the absolute chemical configuration of the calcipotriol molecule's

side chain and determine the crystalline lattice structure of calcipotriol monohydrate.  (DTX 9 at

619; DTX 28 at LEOP0332504-06; Tr. 126:13-16, 123:9-124:23, 148:18-149:11.)

**5.     The Larsen Publication Discloses the '706 Patent
Inventors' Calcipotriol Monohydrate and Prof. Larsen's
Determination of Its Inherent Chemical and Crystalline Structure**

On March 15, 1993, the discovery of calcipotriol monohydrate and the results of the x-

ray diffraction experiments were published as S. Larsen, *et al.*, "Structure and Absolute

Configuration of a Monohydrate of Calcipotriol…," *Acta Crystallographica Section C*, Vol. C49

Part 3 (DTX 9, the "Larsen Publication").  The Larsen Publication's authors are Prof. Larsen and

the three inventors of the '706 patent, Erik Hansen, Niels Andersen, and Lene Hoffmeyer.  (DTX

9 at p. 618; Tr. 122:4-7, 138:5-8, 122:4-123:8.)

Each of the authors contributed to the subject matter of the article.  The '706 patent

inventors collectively synthesized and identified the calcipotriol monohydrate compound

disclosed in the Larsen Publication.  (*See* JTX 1.)  The calcipotriol monohydrate crystals Prof.

Larsen analyzed were from batch ETH 2164, which was created at LEO Pharma by Erik Hansen and provided to Prof. Larsen by Niels Andersen.  (PTX 74; Tr. 148:18-149:11, 121:17-123:18, 126:13-16.)  Before the crystals were sent to Prof. Larsen, Lene Hoffmeyer and Niels Andersen performed IR spectroscopy and DSC (Differential Scanning Calorimetry) and determined that these crystals were a new monohydrate form of calcipotriol.  (PTX 104; PTX 74; Tr. 131:4-135:14, 138:5-139:11, 147:3-148:16.)  The process for making calcipotriol monohydrate described in the Larsen Publication is the ethyl acetate recrystallization process discovered by Erik Hansen in his ETH 2164 experiment.  (Tr. 123:9-124:23.)

Prof. Larsen's only role was to analyze the calcipotriol monohydrate sample provided by the '706 patent inventors.  (*See* DTX 9 at 619.)  "The main purpose of this investigation was to confirm the absolute configuration of the side chain of [the calcipotriol molecule] using single-crystal X-ray diffraction methods."  (*Id.*)  In doing so, Prof. Larsen also determined the crystalline lattice structure of calcipotriol monohydrate, an inherent property of all calcipotriol monohydrate material.  (*See Id.*; Tr. 93:19-94:12, 138:19-139:1.)

## B.    The '706 Patent Inventors Filed a Priority Patent Application Disclosing Calcipotriol Monohydrate Before the Larsen Publication Was Published

The first United States Patent Application on calcipotriol monohydrate was filed on January 7, 1994.  However, the inventors filed a priority patent application in Great Britain on January 15, 1993 that fully disclosed calcipotriol monohydrate.  These applications ultimately resulted in the issuance of the '706 patent.

### 1.    The '706 Patent

The '706 patent issued on June 26, 2007.  (JTX 1.)  It is a reissue of U.S. Patent No. 5,763,426, which originally issued on June 9, 1998.  (*Id.*; JTX 12.)  Its inventors are Erik Hansen, Lene Hoffmeyer, and Niels Andersen.  (JTX 1.)  The '706 patent "invention relates to

calcipotriol, hydrate – a new crystalline form of calcipotriol…." (*Id.* at col. 1, ll. 10-11.)  The '706 patent claims priority to Great Britain Patent Application No. GB 9300763, filed January 15, 1993, two months prior to the March 15, 1993 publication of the Larsen Publication.  (JTX 11, the "1993 GB Priority Application"; *see* DTX 9.)

The '706 patent provides three different methods for identifying calcipotriol monohydrate: IR spectroscopy, solid-state CPMAS NMR spectroscopy, and DSC.  (JTX 1 at col. 2, ll. 29-42.)  The IR spectroscopy and DSC methods are the tests Lene Hoffmeyer and Niels Andersen used in March 1991 to first identify calcipotriol monohydrate.  (PTX 104.)  The patent also contains three examples of how to make calcipotriol monohydrate, one of which is the ethyl acetate recrystallization method Erik Hansen used to make the monohydrate form for the first time in February 1991.  (JTX 1 at col. 2, ll. 21-63.)  The '706 patent contains examples of how to use calcipotriol monohydrate in a pharmaceutical composition as well.  (*Id.* at col. 2, l. 64 – col. 3, l. 39.)  It discusses the benefits of the invention, namely, "[t]he hydrate is technically superior to the anhydrate; it is easily wetted and the wet ball milling process is running smoothly" and is "surprisingly stable" at 40°C after 12 months.  (*Id.* at col. 1, ll. 40-57.)

## 2. Calcipotriol Monohydrate Was Fully Disclosed and Described in the 1993 GB Priority Application

The 1993 GB Priority Application fully disclosed and described calcipotriol monohydrate before the publication of the Larsen Publication.  (*See* JTX 11; DTX 9.)  Like the '706 Patent, the 1993 GB Priority Application discloses three different methods for identifying calcipotriol monohydrate: IR spectroscopy, solid-state CPMAS NMR spectroscopy, and DSC.  (JTX 11 at col. 2, ll. 19-32.)  The application contains three examples of how to make calcipotriol monohydrate, one of which is Erik Hansen's ethyl acetate recrystallization method, as well as one example of the use of calcipotriol monohydrate in a pharmaceutical composition.  (*Id.* at col.

2, l. 6 – col. 4, l. 7.)  Additionally, it discusses the benefits of the invention, namely, that "[t]he

hydrate is technically superior to the anhydrate; it is easily wetted and the wet ball milling

process is running smoothly."  (*Id.* at col. 1, l. 38 – col. 2, l. 2.)  It also states that calcipotriol

monohydrate is "perfectly crystalline, stable and well suited for its use in modern therapy."  (*Id.*

at col. 2, ll. 3-5.)

      The inventors subsequently filed Patent Cooperation Treaty Application No.

WO94/15912 on January 7, 1994.  (JTX 3 at TOLM0000326-32, the "1994 PCT Application.")

The 1994 PCT Application in large part repeated the disclosures of the 1993 GB Priority

Application.  (*See id.*; JTX 11.)  The only difference between the two applications is that the

1994 PCT Application also disclosed a newly discovered inherent property of calcipotriol

monohydrate: its storage stability at 40°C after 12 months.[2]  (JTX 3 at TOLM0000328, ll. 8-16.)

At the time of the 1993 GB Priority Application, LEO Pharma had not yet collected 12 months

of stability data.  (DTX 251.)  The stability data was included in the 1994 PCT Application

because by the time that application was filed, "[s]tability studies [had] demonstrated that

calcipotriol, hydrate is surprisingly stable" at 40°C after 12 months.  (JTX 3 at TOLM0000328,

ll. 8-16.)  The specification of the 1994 PCT Application is virtually identical to the specification

of the '706 patent.  (JTX 1; JTX 3 at TOLM0000326-32.)

      **C.**    **Calcipotriol Monohydrate Was Not the Subject of**
              **A Commercial Offer for Sale Prior to January 7, 1993**

      Calcipotriol monohydrate was not commercially offered for sale in the United States

before January 7, 1993.  Starting in 1989, LEO Pharma had a joint development agreement with

---

[2] Tolmar acknowledges that its invalidity defenses are dependent upon the court's agreement
with LEO Pharma's position that "storage stability at 40°C," "ready wettability," and "suitability
for wet ball milling" are inherent properties of calcipotriol monohydrate.  (*See* Tolmar Br. at 4-
5.)  Therefore, for purposes of this brief, it can be assumed that these properties, including
storage stability, are inherent.  If the court finds that these properties are not inherent, all of
Tolmar's invalidity defenses necessarily fail.

Bristol Myers Squibb (BMS), but calcipotriol monohydrate-containing products were not

covered by this agreement and no calcipotriol monohydrate-containing products were shipped to

BMS before January 7, 1993.  In fact, calcipotriol monohydrate did not exist when this

agreement was signed.  LEO Pharma did ship calcipotriol gel formulations to BMS in June 1992,

but these formulations were provided for research and development purposes only and were

never shown to contain calcipotriol monohydrate.  This shipment is the only event Tolmar points

to that could—were the circumstances different—conceivably give rise to a 35 U.S.C. § 102(b)

"on sale" bar.

### 1.     LEO Pharma and BMS Had an Agreement to<br>Jointly Research and Develop Calcipotriol Products

LEO Pharma and BMS entered into an agreement concerning calcipotriol products on

September 28, 1989.[3]  (DTX 20, "the LEO-BMS agreement.")  That agreement contemplated

both research and development of calcipotriol products and the future sale and marketing of

FDA-approved calcipotriol products in the U.S.  (*Id.* at LEOP0411674.)  The agreement states at

the outset that BMS has "development and marketing expertise within the dermatological field"

and that BMS and LEO Pharma "are interested in collaborating in development and marketing of

[calcipotriol] in the United States of America."  (*Id.*)

Part of the agreement concerns research and development of calcipotriol-containing

products and provides that:

> [t]he development of Licensed Product(s) will take place according
> to a development plan agreed upon by the parties and being part of
> this Agreement as Appendix 4.  It is understood by both parties
> that this development plan is subject to any changes required by
> the FDA for the development of the Licensed Product(s).

---

[3] The original agreement was actually between LEO Pharma and E.B. Squibb & Sons, Inc., a
predecessor organization of BMS.  (*See* DTX 20 at LEOP0411674.)

(*Id.* at LEOP0411686.)  The agreement also states that LEO Pharma will supply BMS with

samples of developmental products to facilitate joint development work:

> In order to enable [BMS] to conduct such development work, LEO
> will provide [BMS] *free of charge* with reasonable quantities of
> Compound and Licensed Product(s).

(*Id.*, emphasis added.)  The agreement contemplates that LEO Pharma will ship samples of

calcipotriol and calcipotriol-containing products to BMS without monetary compensation for use

in research and development work.  Until NDA approval is obtained for a product, the agreement

requires BMS to regularly report to LEO concerning the progress of the development work.  (*Id.*)

The agreement provides for milestone payments when BMS submits and obtains final

FDA approval to market calcipotriol-containing cream and/or ointment products.  (*Id.* at

LEOP0411677-79.)  Another portion of the agreement contains a provision that requires LEO

Pharma to supply BMS with licensed products once those products are approved for marketing in

the U.S.:

> In order to ensure the quality of the Licensed Product(s) to be sold
> by [BMS], [BMS] shall purchase from LEO, and LEO shall supply
> to [BMS], according to supply conditions as laid down in
> Appendix 3 to this Agreement, either from LEO or from such other
> sources as LEO shall authorize by prior notice in writing to [BMS],
> [BMS's] total requirements of the Licensed Product(s) for use and
> sale for the period of 15 (fifteen) years *from first marketing* on the
> following conditions and terms.

(*Id.* at LEOP0411680, emphasis added.)  The agreement then specifies in detail how to calculate

the monetary compensation owed by BMS to LEO Pharma for providing the products, the basic

calculation being 23% of BMS's net sales price for the licensed products.  (*Id.*)  The payment of

money is triggered only by the actual purchase of Licensed Product from LEO Pharma after the

"first marketing" of the Licensed Product by BMS.  (*Id.*)  Thus, any sale or offer for sale was

limited to *FDA-approved* products.

The agreement also grants BMS a license under patents owned by or licensed to LEO Pharma for the use and sale of calcipotriol-containing products in the U.S. and requires that BMS pay royalties to LEO Pharma.  (*Id.* at LEOP0411677-79.)  The payment of royalties is not triggered until and unless BMS sells Licensed Product to a third party.  (*Id.* at LEOP0411688.)

As of January 7, 1993 the agreement nowhere mentioned or referred to calcipotriol monohydrate or the '706 patent.  (*See* DTX 20.)  Appendix 1 of the 1989 agreement provides a list of licensed patents, which contains only the U.S. Application that ultimately issued as the original Calverley patent on the calcipotriol molecule.  (DTX 20 at LEOP0411704; *see* DTX 2.)  The covered "Compound" is depicted as a chemical structure drawing in Appendix 2 of the agreement.  (DTX 20 at LEOP0411705.)  The structure depicts the calcipotriol molecule but does not show the water molecule that is present in calcipotriol monohydrate.  (*See id.*)  The recited molecular weight corresponds to calcipotriol anhydrate, which lacks the water molecule associated with calcipotriol monohydrate.  (*See id.*)

BMS was required to maintain confidentiality of the development work it was doing with LEO Pharma.  (DTX 20 at LEOP0411692; Tr. 66:14-17.)  Any materials exchanged between LEO Pharma and BMS would have been kept confidential and would not have been available to the public.  (Tr. 108:6-10.)

## 2.    LEO Pharma Shipped Calcipotriol Gel Formulations to BMS on June 15, 1992 for Experimental Purposes

The LEO-BMS agreement did not contain any specific provisions regarding a calcipotriol gel in June 1992.  (*See* DTX 20 at LEOP0411662-709.)  On July 6, 1992, the agreement was amended to include a gel product development plan.  (*Id.* at LEOP0411711-19.)  The development plan indicates that in June 1992, the gel product was in its infancy.  (*See id.* at LEOP0411717.)  At this time the product was scheduled to begin stability testing, including tests

of three to four different preservative system options.  (*Id.*)  Acute toxicity screening, human dermal irritation studies, dose-finding studies, and clinical efficacy studies were all scheduled for the future and had yet to take place.  (*Id.*)  The parties did not expect an investigational new drug application (IND) to be filed with the FDA until mid-1993, with development work continuing well into 1994.  (*Id.*)

On June 15, 1992, LEO Pharma shipped samples of five different calcipotriol gel formulations to BMS.  (DTX 250.)  The shipment was made as part of the development collaboration between LEO Pharma and BMS.  (Tr. 64:20-65:11.)  The samples were sent to Dr. Stewart B. Siskin at the BMS Pharmaceutical Research Institute in Buffalo, NY.  (DTX 250.)

The gel formulations had concentrations of calcipotriol ranging from 10 micrograms per gram of gel to 50 micrograms per gram of gel.  (*Id.*)  Each formulation also contained one of four possible different preservative systems.  (*Id.*)  LEO sent the samples to BMS for use in a six-month course of "challenge tests" to determine which of the four preservative systems to use in the final gel formulation.  (DTX 18 at LEOP0292248; DTX 20 at LEOP0411717)  LEO Pharma contemplated that BMS would perform human dermal safety studies and clinical trials with the gel in the future.  (DTX 18 at LEOP0292248; DTX 20 at LEOP0411717)

There is no evidence that BMS ever tested the gel samples it received in June 1992 to determine the crystalline form of the calcipotriol contained therein.  In fact, the only evidence in the record of testing of any kind being performed on these samples is the preservative challenge testing for which the samples were provided.  (DTX 250; DTX 18 at LEOP0292248.)

Under the LEO-BMS agreement, BMS was entitled to have free samples to use in conducting product development work.  (DTX 20 at LEOP0411686; Tr. 66:14-17.)  BMS never paid for any of the material sent during the development collaboration, including the gel samples

sent on June 15, 1992.  (Tr. 65:12-66:3, 66:14-17.)  Although the shipment was sent with an invoice, the invoice itself indicated that the "value [was] only for customs purp[oses]."  (DTX 250 at LEOP0434800.)  Dr. Poul Rasmussen confirmed that no money changed hands and that the invoice's recited value was for customs and tax purposes only.  (Tr. 65:12-66:3, 66:14-17, 108:6-109:5.)

### 3.   Needle-Shaped Crystals Were Sometimes Observed in Calcipotriol Gel, But They Were Never Shown to Be Calcipotriol Monohydrate

On September 16, 1992, Dr. Poul Rasmussen, the head of research and development at LEO Pharma at the time, held a meeting with the '706 patent inventors and several other LEO Pharma employees regarding the appearance of needle-shaped crystals during the manufacture of calcipotriol-containing products.  (DTX 13; Tr. 38:7-18.)  The minutes of that meeting state that calcipotriol anhydrate sometimes converts to calcipotriol monohydrate during the milling of the calcipotriol API to reduce its particle size.  (DTX 13 at LEOP0292244.)  Dr. Rasmussen further explained that "[a]ll [calcipotriol] gel preparations sent for use in clinical trials were produced *without* observing any conversion by milling."  (*Id.*, emphasis added.)  However, on September 9, gel products made on May 20, 1992 were found to contain needle-shaped crystals that were *not* created by milling.  (*Id.*)  Dr. Rasmussen stated that "[r]egardless of the outcome of the milling, after 3-4 months the gel exclusively contains crystalline monohydrate."  (*Id.*)

Dr. Rasmussen's statement about the gel product's calcipotriol monohydrate content in the September 16 meeting minutes was an "assumption" that was "not proved."  (Tr. 74:14-24.) His assumption that the needle-shaped crystals observed in the gel were calcipotriol monohydrate was based on Lene Hoffmeyer's analysis of a single milled batch of calcipotriol anhydrate that converted to needle-shaped crystals during milling.  (*See* Tr. 72:17-73:18, 74:14-75:5; DTX 87 at LEOP0292242.)  Dr. Rasumssen testified that he "assumed at this point, at least

based on this analysis of needles isolated from one [milling] experiment, that these needles [in the gel] were monohydrate." (Tr. 72:17-24.)  He further testified, however, that LEO Pharma "never confirm[ed] that the needles in the gel [were] the monohydrate." (Tr. 99:6-7.)  Gert Høy, the LEO Pharma formulator who worked on the calcipotriol gel product, also testified that he did not recall any testing being performed to determine the identity of the needle-shaped crystals in the gel.  (Tr. 666:6-17.)

In light of further observations after Dr. Rasmussen's initial opinions were expressed in September 1992, LEO Pharma ultimately concluded that the needle-shaped crystals did not always form in the gel and that it was not sure the needles were calcipotriol monohydrate.  In minutes from a later meeting, the head of calcipotriol research, Dr. Ernst Binderup reported that, "[i]n calcipotriol gel there are ***nearly*** always needles, even if no needles were formed during wet milling in connection with the preparation of the batch in question."  (DTX 18 at LEOP0292247, emphasis added.)  He also observed that "[i]t is very likely ***(but not demonstrated)*** that the needles seen in the gel consist of monohydrate."  (*Id.*, emphasis added.)

At this meeting, Dr. Binderup and the other attendees decided that LEO Pharma should use calcipotriol monohydrate as the starting material for its crystal suspension formulations rather than calcipotriol anhydrate.  (*Id.* at LEOP0292247-48.)  Dr. Rasmussen explained the rationale behind the switch at trial:

> We made the decision based on two observations.  One was this identification of the isolated crystals from the latest milling as the monohydrate, and then the observation of needles in the gel preparations.  We did never confirm that the needles in the gel [were] the monohydrate, but it was assumed also in this meeting, quite clearly, and stated rather firmly, I would say, but it was an assumption that also that it was the monohydrate [in the gel formulation], yes, although we used the anhydrate as the API.

(Tr. 99:2-11; *see also* Tr. 72:17-73:18.)

### 4. LEO Pharma Did Not Offer Calcipotriol Monohydrate-Containing Gel Products for Sale Prior to January 7, 1993

As discussed above, LEO Pharma's calcipotriol gel formulation was still under joint development by LEO Pharma and BMS in June 1992. At that time, LEO Pharma did not have FDA approval to sell gel products containing any form of calcipotriol. Clinical trials with the gel formulation were not expected to take place until the fall of 1993. (DTX 18 at LEOP0292248.) In fact, as of October 7, 1992, LEO Pharma and BMS had still not completed testing on the gel and had not made a final choice of what preservative to use in the formulation. (*Id.*) According to Gert Høy, a formulator who worked on the calcipotriol gel project for LEO Pharma, the gel was never commercialized (or FDA-approved) because "[i]t didn't show good enough efficacy." (Tr. 665:17-24.)

## III. ARGUMENT

### A. Claim 1 of the '706 Patent Is Not Anticipated by the Larsen Publication under 35 U.S.C. § 102(a)

Claim 1 of the '706 patent reads:

> Calcipotriol monohydrate characterized by its storage stability at 40° C. after 12 months, its ready wettability and its suitability for wet ball milling.

(JTX 1 at col. 3, ll. 41-43.) Tolmar alleges that Claim 1 is anticipated by the Larsen Publication under 35 U.S.C. § 102(a) because that publication disclosed calcipotriol monohydrate prior to the '706 patent's properly claimed priority date. Ultimately, whether a printed publication is § 102(a) prior art is a question of law. *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1568 (Fed. Cir. 1987). Tolmar bears the heavy burden of establishing that the '706 patent is anticipated by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242, 46 (2011).

Tolmar's anticipation defense fails because the Larsen Publication is not § 102(a) prior art to the '706 patent.  First, regardless of the patent's priority date, the Larsen Publication cannot be § 102(a) prior art because it discloses the '706 patent inventors' own work.  Second, even if the Court finds that the Larsen Publication is a publication by another, it still is not prior art because it was published in March 1993, after the January 15, 1993 priority date to which the '706 patent is entitled.

### 1.    The Larsen Publication Is Not § 102(a) Prior Art to the '706 Patent Because It Discloses the Inventors' Own Work

In his opening statement, Tolmar's counsel noted that it is "the rare case where prior art references [are] written literally by the inventors covering the very compound that is the subject of the patent, but that is exactly what [the Larsen Publication] is…."  (Tr. 26:7-20.)  Indeed, counsel is correct that such cases are necessarily rare because it is well settled that "one's own work is not prior art under § 102(a) even though it has been disclosed to the public in a manner or form which otherwise would fall under § 102(a)."  *In re Katz*, 687 F.2d 450, 454 (C.C.P.A. 1982).  Thus, even if the '706 patent is has only a January 7, 1994 priority date, as Tolmar argues, the Larsen Publication is not § 102(a) prior art to the '706 patent because the allegedly anticipating disclosure in that reference is the inventors' own work.

### a.    The '706 Patent Inventors' Own Work Cannot Be Used Against Them As Prior Art Under 35 U.S.C. § 102(a)

It is "well-settled law that an inventor's own disclosure will not anticipate his later invention unless that prior work is such as to constitute a statutory bar under Section 102(b)." *Lacks Indus., Inc. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1346 (Fed. Cir. 2003) (internal quotation marks omitted); *Riverwood Int'l Corp v. R.A. Jones & Co.*, 324 F.3d 1346, 1355 (Fed. Cir. 2003).  Therefore, "[d]isclosure to the public of one's own work [is a bar

to patentability] only when the disclosure occurred more than one year prior to the date of the

application…."[4]  *Katz*, 687 F.2d at 454.

Courts have consistently held that this rule applies to a description of the invention in a

patent or a printed publication as well as public knowledge or use of the invention.  *Katz*, 687

F.2d at 454 (discussing publications); *In re DeBaun*, 687 F.2d 459, 462-63 (C.C.P.A. 1982)

(discussing patents).  In *Katz*, the CCPA explained why this is the case:

> It may not be readily apparent from the statutory language that a
> printed publication cannot stand as a reference under § 102(a)
> unless it is describing the work of another.  A literal reading might
> appear to make a prior patent or printed publication "prior art"
> even though the disclosure is that of the applicant's own work.
> However, such an interpretation of this section of the statute would
> negate the one year period afforded under § 102(b) during which
> an inventor is allowed to perfect, develop and apply for a patent on
> his invention and publish descriptions of it if he wishes.

687 F.2d at 454.  As a result, if the Larsen Publication is a disclosure of the '706 patent

inventors' own work, it cannot be § 102(a) prior art.

**b.  The Larsen Publication Discloses the '706 Patent
Inventors' Own Work Because They Invented the
Calcipotriol Monohydrate Disclosed in the Publication**

The undisputed facts plainly demonstrate that the Larsen Publication discloses the work

of the '706 patent inventors, and that Prof. Larsen's contribution to that publication is

superfluous to the description of calcipotriol monohydrate.  The Larsen publication reports the

existence of calcipotriol monohydrate (the name itself tells a chemist that one molecule of water

for every molecule of calcipotriol is incorporated in the crystalline lattice), provides a method for

making it, and describes its usefulness in treating psoriasis.  (DTX 9 at 619.)  Those disclosures

---

[4] Tolmar has never argued before this Court that the Larsen Publication gives rise to a § 102(b)
statutory bar.  (*See* Tolmar Opening Br. at pp. 26-34.)  In any event, there can be no dispute that
the March 1993 Larsen Publication was published after January 7, 1993, the critical date for §
102(b) purposes.  *See infra* Section III.B.; Tolmar Br. at p. 35 n.5.)

reflect solely the work of the '706 inventors.  Dr. Larsen's confirmatory X-ray analysis is not required for a POSA to make and use the monohydrate.

Whether a reference is § 102(a) prior art or the inventors' own work turns on the "evidentiary issue of who invented the subject mater disclosed by the reference." *Riverwood*, 324 F.3d at 1356 (internal quotations omitted) (citing *DeBaun*, 687 F.2d at 462).  A district court "must look beyond the superficial fact" that there may be differences between the inventors of the patent-in-suit and the authors or inventors listed in the reference.  *Riverwood*, 324 F.3d at 1356.  "What is significant is not merely the differences in the listed inventors [or authors], but whether the portions of the reference relied on as prior art, and the subject matter of the claims in question, represent the work of a common inventive entity." *Id*.  A reference is not the work of "another" as required by § 102(a) if its author derived her knowledge of the invention from the inventors of the patent-in-suit.  *See In re Mathews*, 408 F.2d 1393, 1395 (C.C.P.A. 1969).

Establishing that a reference discloses the inventors' own work is distinct from and alternative to "antedating" an alleged prior art reference by establishing a date of invention before the effective date of the reference.  *In re Costello*, 717 F.2d 1346, 1348-49 (Fed. Cir. 1983); *DeBaun*, 687 F.2d at 462.  Thus, the requirements for antedating a reference, including proof that the invention was reduced to practice (*e.g.,* by filing a priority application) before the effective date of the reference, or diligence leading up to a subsequent reduction to practice, do not apply.  *See Costello*, 717 F.2d at 1349-50.  The proper inquiry is whether the evidence establishes, "in light of the total circumstances of the case, that the reference reflect[s] [the inventors'] own work." *DeBaun*, 687 F.2d at 462-63.

When presented with facts strikingly similar to the case at hand, the Court of Customs and Patent Appeals (CCPA) held that a reference was not § 102(a) prior art because it disclosed

the inventors' own work.[5]   *In re Katz*, 687 F.2d 450 (C.C.P.A. 1982).  In *Katz,* the alleged prior

art reference was a publication in a scientific journal authored by Katz, the sole inventor of the

patent-in-suit, and two others.  *Id.* at 452.  Katz submitted a declaration to the patent office

stating that he was the sole inventor of the subject matter described in the journal article.  *Id.*

The declaration explained that the two other authors were students working under Katz's

direction and supervision and that, although they were co-authors of the publication, they were

not co-inventors of the subject matter.  *Id.*  The Patent and Trademark Office Board of Appeals

held that Katz's declaration was insufficient and sustained the examiner's rejection of Katz's

claims under § 102(a).  *Id.*

The CCPA reversed.  *Id.* at 456.  The court noted that "[t]he content and nature of the

printed publication, as well as the circumstances surrounding its publication, not merely its

authorship, must be considered."  *Id.* at 455.  The court found that the explanation in Katz's

sworn declaration was "a clear alternative conclusion to the board's inference that [the other

authors'] names were on the article because they were co-inventors."  *Id.*  In view of the totality

of the circumstances, the court found that Katz "made a sufficient showing that the cited

publication discloses his invention."  *Id.* at 456.

Like the publication in *Katz*, the Larsen Publication here was co-authored by the

inventors of the patent-in-suit and another author, Prof. Larsen.  (DTX 9.)  *Katz*, 687 F.2d at 452.

Also as in *Katz*, the ***undisputed*** facts clearly show that the disclosures in the Larsen Publication

relied upon by Tolmar in its anticipation defense represent the invention of only Messrs. Hansen

and Andersen and Ms. Hoffmeyer.  *See Katz*, 687 F.2d at 455-56.  (Tolmar Br. at 11-13.)  The

---

[5] Tolmar may attempt to distinguish cases like *Katz* and *DeBaun* because they were appeals from
the PTO, but such arguments are unavailing.  The Federal Circuit has indicated that the same
principles apply in post-issuance validity challenges.  *Riverwood*, 324 F.3d at 1356.

calcipotriol monohydrate crystals Prof. Larsen analyzed and described in the Larsen Publication came from batch ETH 2164, which was prepared at LEO Pharma by Erik Hansen and provided to Prof. Larsen by Niels Andersen. (Tolmar Br. at 12; PTX 74; PTX 98 at LEOP0225944; Tr. 148:18-149:11, 121:17-123:18, 126:13-16.) Before the crystals were sent to Prof. Larsen, Lene Hoffmeyer and Niels Andersen determined that these crystals were a new monohydrate form of calcipotriol. (Tolmar Br. at 11-12; PTX 104; PTX 74; Tr. 131:4-135:14, 138:5-139:11, 147:3-148:16.) Additionally, the process for making calcipotriol monohydrate described in the Larsen Publication is the ethyl acetate recrystallization process discovered by Erik Hansen in his ETH 2164 experiment. (Tolmar Br. at 12-13; Tr. 123:9-124:24; PTX 98 at LEOP0225944.) Thus, it is clear that the inventors alone invented the subject matter disclosed in the Larsen Publication and that all of Prof. Larsen's knowledge concerning calcipotriol monohydrate was derived from the inventors. *See Mathews*, 408 F.2d at 1395; *DeBaun*, 687 F.2d at 462-63.

Professor Larsen's elucidation of the single-crystal structure of calcipotriol monohydrate does not establish her as an inventor of the subject matter disclosed in the Larsen Publication. The single-crystal structure, as determined by x-ray diffraction, is but one of many inherent properties of a crystalline form. (Tr. 308:23-309:20, 311:7-313:08.) It is well-settled law that discovery of an inherent property of an existing composition of matter is not inventive. *Atlas Powder Co. v. Ireco Inc.,* 190 F.3d 1342, 1347 (Fed. Cir. 1999). A composition of matter is invented when it is completely composed and identified, which occurred when inventors Hoffmeyer and Andersen identified Hansen's crystals as calcipotriol monohydrate. *See Pfaff v. Wells*, 525 U.S. 55, 57 n.2 (1998). Indeed, the Larsen Publication reports the identity of and process for making the monohydrate form of calcipotriol in the first few paragraphs, before describing Prof. Larsen's own x-ray diffraction work. (*See* DTX 9 at 619.) Moreover, ***none*** of

Prof. Larsen's data were included in the description of the invention in the '706 patent specification and Tolmar has never alleged that Prof. Larsen should have been named as an inventor.  (*See* JTX 1.)[6]

It is of no moment that the Larsen Publication itself does not specifically delineate the contributions of each of its authors.  *See Katz*, 687 F.2d at 455.  Indeed, "authorship of an article by itself does not raise a presumption of inventorship of the subject matter disclosed in the article."  *Id.*  In *Katz*, the publication in question was ambiguous as to inventorship, but the court considered all of the evidence before it and determined that Katz was the sole inventor of the subject matter disclosed in the publication.  *Id.* at 455-56.

This Court may rely on documentary and testimonial evidence to determine the contributions of the respective authors to the Larsen Publication and decide whether the allegedly anticipating material is solely the '706 patent inventors' work.  Indeed, a judge on this Court has previously held that a printed publication that contained ***no*** information about who developed the device disclosed was not prior art because it was not the work of another. *Mannesman Demag Corp. v. Engineered Metal Prods. Co.*, 226 U.S.P.Q. 466 (D. Del. 1985). The alleged prior art in *Mannesman* was a promotional flyer advertising a device that fit the description of the invention.  *Id.* at 468.  The defendants pointed out that the inventor's name appeared nowhere in the brochure, but offered no other evidence that the device in the brochure was developed by another.  *Id.* at 472.  Testimonial and documentary evidence offered by the plaintiff, however, made it clear that the inventor had created the device advertised in the

---

[6] This is because the single-crystal structure is one inherent property of calcipotriol monohydrate but is not required to make, identify, and use the compound.  Additionally, Prof. Larsen's elucidation of the orientation of the side chain, and in particular the 24-hydroxyl group, is not part of the invention because it does not depend on whether the compound was a monohydrate or anhydrate.  It is the calcipotriol molecule itself that has one particular orientation.

brochure.  *Id.*  The court found that, "[b]ased on the uncontradicted evidence of record," the

brochure was a description of the inventor's invention and therefore not prior art.  *Id.*

     Like the publications in *Mannesman* and *Katz*, the Larsen Publication itself is silent as to

which of the authors invented the calcipotriol monohydrate disclosed therein.  (DTX 9.)  But, as

discussed above, the undisputed evidence plainly demonstrates that the calcipotriol monohydrate

disclosed in the Larsen Publication was invented by Erik Hansen, Lene Hoffmeyer, and Niels

Andersen.  *See Katz*, 687. F.2d at 455-56; *Mannesman*, 226 U.S.P.Q. at 472.  Consequently, the

Larsen Publication constitutes the inventors' own work and is not § 102(a) prior art.

### 2. The Larsen Publication Is Not § 102(a) Prior Art Because It Was Published after the '706 Patent's January 15, 1993 Priority Date

     The Larsen Publication was published on March 15, 1993, before the filing of the 1994

PCT Application but ***after*** the filing of the 1993 GB Priority Application.  (DTX 9; JTX 11; JTX

3 at TOLM0000326.)  It is elementary that a publication cannot be prior art unless it is published

***before*** a patent's properly claimed priority date.  *In re Gosteli*, 872 F.2d 1008, 1010 (Fed. Cir.

1989).  Therefore, as Tolmar implicitly acknowledges, even if the court finds that the Larsen

Publication is "by another," it cannot be prior art if the '706 patent is entitled to claim priority to

the 1993 GB Application.  (*See* Tolmar Br. at 26-27.)  Because the 1993 GB Priority Application

discloses calcipotriol monohydrate and, necessarily, all of its inherent properties, the '706 patent

is entitled to claim priority to the 1993 GB Priority Application's January 15, 1993 filing date

and the Larsen Publication cannot be prior art.

### a. The '706 Patent is Entitled to a January 15, 1993 Priority Date So Long As the GB 1993 Application Adequately Describes the Invention

     Claims of priority to a foreign patent application are governed by 35 U.S.C. § 119, which

provides that:

> An application for patent for an invention filed in this country by
> any person who has…previously regularly filed an application for
> a patent for the same invention in a foreign country…shall have
> the same effect as the same application would have if filed in this
> country on the date on which the application for patent was first
> filed in such foreign country…

35 U.S.C. § 119(a).  In other words, § 119 allows a U.S. patent applicant to claim the benefit of

the filing date of an earlier-filed foreign application for, among other purposes, determining

whether a reference is prior art.  Assuming, *arguendo*, that Tolmar has come forward with

evidence that the Larsen Publication is 35 U.S.C. § 102(a) prior art to the '706 patent, LEO

Pharma would have the burden of producing evidence that the '706 patent has a priority date that

predates the publication.  *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1328-29 (Fed.

Cir. 2008).  But the ultimate burden of persuasion to demonstrate invalidity by clear and

convincing evidence never shifts and always remains with Tolmar, the party challenging validity.

*Id.*  (*See* Tolmar Br. at 26-27.)

To claim priority to a foreign application under 35 U.S.C. § 119, the foreign application

must comply with the requirements of 35 U.S.C. § 112.  *In re Gosteli*, 872 F.2d 1008, 1010-11

(Fed. Cir. 1989).  The only requirement of § 112 at issue here is the requirement that "[t]he

specification…contain a written description of the invention…."  (*See* Tolmar Br. at 26.)

Adequate written description requires that the applicant "convey with reasonable clarity to those

skilled in the art that, as of the filing date sought, he or she was in possession of the [claimed]

invention.  *Laryngeal Mask Co. v. Ambu A/S*, 618 F.3d 1367 (Fed. Cir. 2010).  If the 1993 GB

Application satisfies this requirement, the '706 patent gets the benefit of the foreign application's

January 15, 1993 filing date as its priority date.

**b.     The Later Disclosure of Calcipotriol Monohydrate's
Inherent Storage Stability Does Not Deprive
the '706 Patent of Its 1993 Priority Date**

Tolmar argues that the '706 patent cannot claim priority to the 1993 GB Application based solely on the fact that the 1993 GB Application does not expressly disclose calcipotriol monohydrate's inherent "storage stability at 40° C. after 12 months" as recited in Claim 1.  (*See* Tolmar Br. at 26-34; JTX 1.)  Tolmar is correct that ***express*** disclosure of the storage stability property first occurred in the 1994 PCT Application.  But, the 1993 GB Application satisfies the written description requirement because it discloses calcipotriol monohydrate and, consequently, ***necessarily and inherently*** discloses all of calcipotriol monohydrate's inherent properties, including storage stability.

Tolmar completely ignores a large body of controlling Federal Circuit and CCPA case law that squarely contradicts its position.  That precedent makes clear that "[t]he disclosure in a subsequent patent application of an inherent property of a product does not deprive that product of the benefit of an earlier filing date."  *Kennecott Corp. v. Kyocera Int'l, Inc.*, 835 F.2d 1419, 1423 (Fed. Cir. 1987).  This is because "[b]y disclosing in a patent application a device that inherently performs a function, operates according to a theory, or has an advantage, a patent applicant necessarily discloses that function, theory, or advantage even though he says nothing concerning it."  *Id.* at 1422 (Fed Cir. 1987) (quoting *In re Reynolds*, 443 F.2d 384, 389 (C.C.P.A. 1971)).  Notwithstanding Tolmar's arguments to the contrary, cases in which adequate written description is established through inherent disclosure are neither "rare" nor "special" and these principles are not applied "sparingly."  (Tolmar Br. at 32.)  *See, e.g., Therma-Tru Corp. v. Peachtree Doors Inc.*, 44 F.3d 988, 993 (Fed. Cir. 1995); *In re Edwards*, 568 F.2d 1349 (C.C.P.A. 1978); *In re Nathan*, 328 F.2d 1005 (C.C.P.A. 1964); *In re Reynolds*, 443 F.2d 384

(C.C.P.A. 1971); *Novo-Nordisk A/S v. Becton Dickinson & Co.*, 96 F. Supp. 2d 309, 314 (S.D.N.Y. 2000).[7]

Here, Tolmar must concede that "storage stability at 40° C. after 12 months" is an inherent property of calcipotriol monohydrate or withdraw its anticipation defense because the alleged anticipatory prior art, the Larsen Publication, does not expressly disclose storage stability. (*See* DTX 9.)  In any event, LEO Pharma's expert, Dr. Joel Bernstein, testified that "storage stability at 40° C. after 12 months" is an inherent property possessed by any given sample of calcipotriol monohydrate. (Tr. 317:13-319:22.)  He explained that a person of ordinary skill in the art would not believe that there is any difference between "calcipotriol monohydrate" and "calcipotriol monohydrate characterized by its storage stability at 40° C. after 12 months." (Tr. 362:13-363:23.)  Dr. Bernstein further testified that a person of ordinary skill in the art reading the disclosure of the 1993 GB Priority Application would understand that the inventors were in possession of the calcipotriol monohydrate invention. (Tr. 678:24-679:4.)  Thus, it is clear that '706 patent can claim priority to the 1993 GB Priority Application because it inherently discloses the "storage stability" limitation of Claim 1 of the '706 patent.

> ### c. The Recitation of Calcipotriol Monohydrate's Inherent Storage Stability in Claim 1 Does Not Deprive the '706 Patent of Priority

Nonetheless, Tolmar argues that LEO Pharma cannot rely on an inherent disclosure of storage stability in the 1993 GB Priority Application because the '706 patent was amended during prosecution to recite the storage stability property as a claim "limitation." (Tolmar Br. at 33.)  Yet, the Federal Circuit has made clear that:

---

[7] Many inherent disclosure cases arise under 35 U.S.C. § 120, which governs claims of priority to earlier-filed U.S. patent applications.  However, these cases and principles are applicable here because the Federal Circuit has held that foreign priority applications under § 119 are subject to the same written description requirement as U.S. applications under § 120. *Gosteli*, 872 F.2d at 1010-11.

> The disclosure in a subsequent patent application of an inherent
> property of a product does not deprive that product of the benefit
> of an earlier filing date. ***Nor does the inclusion of a description of
> that property in later-filed claims change this reasonable result***.

*Kennecott*, 835 F.2d at 1423 (emphasis added).  *In Kennecott*, all of the patent claims related to a

material "having a predominantly equiaxed microstructure." *Id.* at 1420.  The plaintiff claimed

priority to an earlier-filed application that did not contain a description of the equiaxed

microstructure and lacked photomicrographs showing the microsctructure, which were added to

the specification later.  *Id.*  The defendant argued that the claims did not get the benefit of the

priority date, but admitted that the microstructure was an inherent property of the invention

described in the earlier filed application.  *Id.* at 1421.  The court held that the inherent description

of the claimed microstructure in the earlier-filed application satisfied the written description

requirement and that the claims were therefore entitled to their priority date.  *Id.* at 1422-23.

Likewise, in *In re Reynolds*, the claims at issue were drawn to a capacitor and contained

the limitation that the capacitor comprise "means for preventing an abrupt change in the

capacitance characteristic of the capacitor."  443 F.2d 384, 387-88 (C.C.P.A. 1978.)  The claims

were rejected by the patent examiner under § 112 for lack of written description because the

specification as filed did not expressly teach a structure for preventing abrupt change of

capacitance.  *Id.*  The C.C.P.A. reversed and concluded that the application as filed did support

the claims because the structure illustrated in one of the figures in the specification would

inherently perform the function recited in the claims.  *Id.* at 388-89.  The later amendment to

recite the inherent function in the claims did not add new matter and did not run afoul of the

written description requirement.  *Id.* at 389.

The case law unequivocally supports that the amendment of Claim 1 of the '706 patent

during prosecution to include a "limitation" that calcipotriol monohydrate is characterized by its

inherent "storage stability" does not deprive the '706 patent of its claim to its January 15, 1993

priority date based on the inherent disclosure of that property in the 1993 GB Priority

Application.

        **d.**      **There Is No Legal Basis for Tolmar's Purported "Immaterial
to Patentability" Limitation on Inherent Disclosure**

Tolmar conjures a new legal principle: a patent is not entitled to rely on inherent

disclosure of a property in a priority application if the inherent property is "material to

patentability" of the claimed invention.  (*See* Tolmar Br. at 31-33.)  But Tolmar's principle finds

no support in the lone case it cites, and is contrary to decades old case law.

The CCPA's decision in *In re Nathan* squarely refutes Tolmar's assertion that only

properties "immaterial to patentability" can be inherently disclosed in an application.  328 F.2d

1005 (C.C.P.A. 1964).  In *Nathan*, the patent at issue claimed specific chemical compounds.  *Id.*

at 1006.  During prosecution, the examiner rejected the claims as "unduly broad and indefinite"

because they failed to specify whether the configuration of the compounds was "alpha" or

"beta."  *Id.*  In response, the applicant amended the claims to specify that the compounds had the

"alpha" configuration, an amendment that was plainly "material" to patentablity.  *Id.* at 1006-07.

The examiner rejected the claims again, this time for adding new matter that was not adequately

described in the application as filed.  *Id.* at 1007.

The applicants appealed, alleging that the amendments "merely define[d] more precisely

for those skilled in the art the [compounds] inherently produced by the process [disclosed in] the

application as filed and identified therein by physical characteristics."  *Id.* at 1008 .  The CCPA

agreed that the property was inherent and held that the application contained a sufficient inherent

disclosure of the "alpha" limitation.  *Id.*  The court noted that the application chemically named

the claimed compounds, provided a method for making them, and also described them by

melting point range, among other properties.  *Id.* at 1008-09.  Significantly, the court did ***not***

refuse to recognize the inherent disclosure of the "alpha" limitation merely because it was added

to the claims in response to a rejection by the examiner.  *See id*. at 1008-09.

Here, the 1993 GB Priority Application describes and names calcipotriol monohydrate,

describes several methods for making and identifying calcipotriol monohydrate, and discloses

examples of the use of calcipotriol monohydrate in pharmaceutical compositions.  (JTX 11.)  A

description of an inherent property not expressly described in the 1993 GB Priority Application,

storage stability, was later added to the claims in response to a rejection by the examiner.  (JTX 3

at TOLM0000397.)[8]  But, as in *Nathan*, the addition of that inherent storage stability property to

the claims in response to the examiner's rejection does not negate that the GB 1993 Application

inherently discloses that property by disclosing the calcipotriol monohydrate compound.  *See*

*Nathan*, 328 F.2d at 1008-09.

Indeed, in at least one case, a court has held that a priority application can satisfy the

written description requirement even if the ***claimed compound itself*** is disclosed inherently.  The

patent at issue in *In re Edwards* claimed a chemical compound having a specified chemical

formula and the property of undergoing certain chemical reactions to form a particular product.

568 F.2d 1349, 1350 (C.C.P.A. 1978).  To avoid prior art, the applicant needed to establish

priority to a parent U.S. application.  *Id.*  The PTO concluded that the applicant could not claim

priority to the parent application because it contained no written description of the claimed

compound.  *Id.* at 1351.

---

[8] As discussed in LEO Pharma's claim construction briefs and opening post trial brief, LEO
Pharma contends that the amendment of the claims emphasized certain inherent, advantageous
properties of calcipotriol monohydrate but did not further limit the claims to calcipotriol
monohydrate shown to "exhibit" the recited properties.  (LEO Pharma Opening Br. at 36-48.)

The CCPA disagreed, noting that "the invention claimed does not have to be described in *ipsis verbis* in order to satisfy the description requirement of § 112." *Id.* at 1353 (citations omitted). The court held that the parent application's description of chemical reactions that inherently produced the claimed compound as their predominant product was an adequate description of the claimed compound. *Id.* at 1352. Clearly if the disclosure in *Edwards* of a reaction that inherently produces a compound can be a sufficient written description of a compound later claimed by recitation of its chemical formula and an inherent property, there is no "immaterial to patentability limitation" on inherent disclosures as Tolmar contends here. *See Edwards*, 568 F.2d at 1354.

Tolmar cites a single case, *Hitzeman v. Rutter*, in support of its "immaterial to patentability" limitation, but that case is inapposite. 243 F.3d 1352 (Fed. Cir. 2001). *Hitzeman* was an interference proceeding concerning the invention of a method of producing a hepatitis B protein in yeast, wherein the protein produced has the same particle size and sedimentation rate as the protein produced by the hepatitis B virus itself. *Id.* at 1352-53. Because Rutter was the first to reduce the method to practice and file a patent application, Hitzeman attempted to establish that he was actually the first to *invent* the method because he *conceived* of it before Rutter's reduction to practice. *Id.* at 1350-51.

But, there was no evidence that Hitzeman conceived of the particle size and sedimentation rate before Rutter's reduction to practice, so Hitzeman argued that because the properties were inherent to the yeast, he had "inherently conceived" of them. *See id.* However, the court found that these two claim limitations were "material limitations" that were "central to the patentability of the invention." 243 F.3d at 1355. Proof of "inherent conception" was therefore not enough and Hitzeman was not entitled to priority because he could not expressly

prove that he had conceived of those material limitations prior to Rutter's invention date.  *Id.* at 1355-59.[9]

LEO Pharma, by contrast, does not rely on a theory of "inherent conception" as Hitzeman attempted to do.  Rather, LEO Pharma has demonstrated that the 1993 GB Priority Application inherently ***discloses*** the storage stability of calcipotriol monohydrate.  It is well-established law that the filing of a foreign application entitled to priority under 35 U.S.C. § 119 constitutes a constructive reduction to practice of all subject matter adequately disclosed in the application.  *In re Mulder*, 716 F.2d 1542, 1544-45 (Fed. Cir. 1983).  As discussed in detail above, the GB 1993 application adequately discloses the invention under § 112 because it discloses calcipotriol monohydrate and therefore inherently discloses calcipotriol monohydrate's storage stability at 40°C after 12 months.  Clearly, the "inherent conception" doctrine of *Hitzeman* with its "immaterial to patentability" requirement is completely irrelevant to the issue of priority in this case.

In any event, even if *Hitzeman* did concern the written description requirement, it could not have overruled almost fifty years of Federal Circuit and CCPA jurisprudence establishing that an application may disclose a property of an invention by inherency.  *Hitzeman* is a 2001 decision of a three-judge panel of the Federal Circuit.  243 F.3d at 1348.  A three-judge panel of the Federal Circuit is bound by prior precedential decisions, including decisions of the CCPA, unless and until they are overturned by the court sitting *en banc*.  *Kimberly-Clark Corp. v. Fort Howard Paper Co.*, 772 F.2d 860, 863 (Fed. Cir. 1985); *South Corp. v. United States*, 690 F.2d

---

[9] *Hitzeman* cites *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264 (Fed. Cir. 1991) for the proposition that inherent properties must be contemporaneously recognized by persons of ordinary skill in the art.  243 F.3d at 1355.  The Federal Circuit has since clarified that *Continental Can* merely stands for the proposition that the prior art must be examined through the eyes of a person of ordinary skill in the art.  *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003).

1368, 1371 (Fed. Cir. 1982).  Thus, the earlier CCPA and Federal Circuit panel decisions establishing the doctrine of inherent disclosure are still binding precedent upon this Court and could not have been overturned by *Hitzeman*.  *See, e.g.*, *In re Reynolds*, 443 F.2d 384, 389 (C.C.P.A. 1971); *Kennecott Corp. v. Kyocera Int'l, Inc.*, 835 F.2d 1419, 1423 (Fed. Cir. 1987).

### e.   **The Facts Here Mirror *Silvestri v. Grant*, Not *Hitzeman***

Even assuming that the *Hitzeman* decision is applicable to this case and that it somehow overturned almost fifty years of unrelated case law, as LEO Pharma has explained in extensive detail in its two claim construction briefs and its Opening Post Trial Brief, this case presents entirely different circumstances from *Hitzeman*.  (*See* Opening Br. at 36-40.)  Here, the recitation of the "storage stability" property in Claim 1 of the '706 patent does not "add anything to claim definition of the named compound" because "the balance of the claim [i.e., the term 'calcipotriol monohydrate'] fully identifies the compound."  *In re Ruschig*, 343 F.2d 965, 972-73 n.8 (C.C.P.A. 1965).  (*See* Opening Br. at pp. 38-39.)  Indeed, this case largely mirrors the facts of *Silvestri v. Grant*, where the court held that the later recitation of the inherent storage stability and molecular weight of a claimed crystalline form did not deprive a party of priority in an interference proceeding.  496 F.2d 593, 595, 599 (C.C.P.A. 1974).  (*See* LEO Pharma Opening Br. at pp. 39-40.)

*Hitzeman* is distinguishable for another reason as well.  In *Silvestri*, the party attempting to establish priority (Silvestri) had clearly demonstrated that he had prepared the claimed crystalline form and appreciated that he had obtained a new crystalline form prior to the other party's invention date.  *Silvestri*, 496 F.2d at 597.  The only question was whether he had also invented the storage stability and molecular weight properties recited in the claim.  *Id.* at 599.  The court ruled that he had because the properties were inherent and did not add anything to the definition of the crystalline form contained in the balance of the claim.  *Id.*  By contrast, in

*Hitzeman*, Hitzeman alleged that he had conceived of the inherent properties of particle size and sedimentation rate even though he had not yet run experiments to obtain the actual protein possessing those inherent properties. *See Hitzeman*, 243 F.3d at 1351. The case at hand is plainly analogous to *Silvestri* and distinguishable from *Hitzeman* because it is undisputed that the '706 patent inventors had prepared and characterized the calcipotriol monohydrate compound possessing the inherent property at issue by the time the 1993 GB Application was filed. *See supra* Section II.A.

> **B.** **The '706 Patent is Not Invalid Under 35 U.S.C. § 102(b)**
> **Because Calcipotriol Monohydrate Was Not the Subject**
> **of a Commercial Offer for Sale Before January 7, 1993**

Neither calcipotriol monohydrate nor pharmaceutical compositions containing it were the subject of a commercial offer for sale prior to January 7, 1993. Therefore, claims 1 and 2 of the '706 patent are not invalid under the so-called "on-sale" bar to patentability of 35 U.S.C. §102(b), which provides that:

> A person shall be entitled to a patent unless…the invention
> was…on sale in this country more than one year prior to the date
> of application for patent in the United States.

The assessment of the validity of a patent claim in light of an alleged sale involves (1) determining whether a "sale" truly occurred within the meaning of §102(b); (2) construing the patent claims to determine their scope and meaning; and (3) comparing the asserted claims with the device or process that was allegedly sold to determine if the alleged sale was of the claimed invention. *Minton v. Nat'l Assn. of Sec. Dealers, Inc.*, 336 F.3d 1373, 1376 (Fed. Cir. 2003). When determining whether a "sale" occurred, subject matter is "on sale" if it was (a) subject to a commercial offer for sale and (b) "ready for patenting" prior to the critical date. *Id.* at 1377 (citing *Pfaff v. Wells*, 525 U.S. 55, 67 (1998)). The party challenging validity always has the burden of proving an on-sale bar by clear and convincing evidence. *Id.* at 1376.

Here, Tolmar plainly cannot meet that burden.  First, assuming an offer for sale took place prior to January 7, 1993, it was not an offer for sale of the claimed invention.[10]  Tolmar points to only one event that could even conceivably constitute a §102(b) "on-sale" bar to claims 1 and 2 of the '706 patent:  LEO Pharma's shipment of calcipotriol gel samples to Bristol Myers Squibb (BMS) on June 15, 1992 "pursuant to the LEO-BMS agreement."  (Tolmar Br. at 39-40.)  But Tolmar offers no evidence, let alone clear and convincing evidence, that the gel samples LEO Pharma shipped to BMS contained calcipotriol monohydrate.

Second, even if the gel samples contained calcipotriol monohydrate, the unrebutted evidence shows that no consideration passed in the June 15, 1992 transaction.  Therefore, Tolmar must rely upon the 1989 LEO-BMS agreement to establish the "commercial" character of that transaction.  However, a transaction under the LEO-BMS agreement could not have been a commercial offer for sale of the claimed invention because the agreement does not cover calcipotriol-monohydrate-containing products.  And, even if it did, the gel products shipped on June 15, 1992 were clearly provided for experimental purposes pursuant to the research and development portion of the agreement, not the commercial supply provision.

Lastly, no calcipotriol monohydrate-containing formulation was "ready for patenting" as of the critical date.

### 1. There is No Evidence that the Gel Samples Shipped to BMS on June 15, 1992 Contained Calcipotriol Monohydrate

A fundamental component of any § 102(b) analysis is "a comparison of the asserted claims with the device or process that was sold."  *Minton*, 336 F.3d at 1376.  "A determination that a claim is invalid as being anticipated requires factual findings that each and every limitation

---

[10] It is undisputed that LEO Pharma filed the 1994 PCT Application on January 7, 1994 and that this is the earliest effective U.S. filing date for the '706 patent.  Therefore, it is also undisputed that the "critical date" for on-sale bar purposes is January 7, 1993, one year prior to that date.

is found either expressly or inherently in the device or process that was sold." *Id.* (internal quotations omitted). "Because a patent is presumed to be valid [] and this presumption can only be overcome by clear and convincing evidence of facts to the contrary, the facts underlying a conclusion that a claim is unpatentable in light of a sale must be proven with clear and convincing evidence." *Id.* (internal citations omitted).

Tolmar cannot meet this heavy burden. There is simply no evidence that calcipotriol monohydrate, the claimed compound, was present in the gel formulations shipped to BMS on June 15, 1992. Tolmar contends that the shipment was a § 102(b) offer for sale of a calcipotriol monohydrate-containing product because (1) Leo Pharma observed needle-shaped crystals in other samples of its calcipotriol gel and (2) later determined those needles were calcipotriol monohydrate. But Tolmar is wrong on both counts. There is no evidence that the gel samples shipped to BMS contained needle-shaped crystals and no evidence that any needle-shaped crystals ever observed in LEO Pharma's calcipotriol gel were calcipotriol monohydrate. Therefore, the shipment upon which Tolmar relies cannot be an "on-sale" bar to claims 1 and 2 of the '706 patent.

### a.   There is No Evidence that the Gel Shipped to BMS on June 15, 1992 Contained Needle-Shaped Crystals

Regardless of the identity of the needle-shaped crystals observed in LEO Pharma's gel product, Tolmar has failed to prove that the gel samples sent to BMS actually contained needle-shaped crystals. There is no evidence that either LEO Pharma or BMS ever observed needle-shaped crystals in the five gel batches shipped to BMS in June 1992. In fact, the evidence suggests that needle crystals do not always appear in batches of LEO Pharma's gel. In October 7, 1992 meeting minutes, Dr. Ernst Binderup observed that "[i]n calcipotriol gel there are ***nearly***

always needles, even if no needles were formed during wet milling in connection with the preparation of the batch in question." (DTX 18 at LEOP0292247, emphasis added.)

Additionally, even if needle-shaped crystals did always form in LEO Pharma's gel, Dr. Poul Rasmussen's meeting minutes suggest that the process of needle formation takes "3-4 months." (DTX 13 at LEOP0292244.) For example, it was not until September 9, 1992 that gel products made at LEO Pharma on May 20, 1992 were found to contain needle-shaped crystals that formed *in situ* in the gel. (*Id.*) Here, the gel products Tolmar alleges constitute an on-sale bar were shipped on June 15, 1992. There is no evidence in the record concerning when those gel products were made or how long BMS retained the samples. Thus, even if needle formation were inevitable, there is no evidence that the gel product was actually in BMS's possession for a long enough incubation period to produce the needle crystals.

### b. There is No Evidence That Any Needle-Shaped Crystals Ever Observed in LEO Pharma's Gel Product Were Calcipotriol Monohydrate

Second, even assuming that the gel sent to BMS in June 1992 contained needle-shaped crystals like those observed in the gel at LEO Pharma in September 1992, there is no evidence that ***any*** needle-shaped crystal ever found in LEO Pharma's gel was in fact identified as calcipotriol monohydrate. The record is devoid of any evidence that the needle-shaped crystals observed at LEO Pharma were ever tested to determine their crystalline form, let alone evidence that the specific batches shipped to BMS were tested to determine if any needle-shaped crystals contained therein were calcipotriol monohydrate. Tolmar relies exclusively upon LEO Pharma meeting minutes for the proposition that the needle-shaped crystals were necessarily calcipotriol monohydrate. However, Tolmar conveniently fails to acknowledge Dr. Binderup's qualification in the October 7, 1992 meeting minutes that it was "***not demonstrated*** [] that the needles seen in the gel consist of monohydrate." (DTX 18 at LEOP0292247, emphasis added.) Tolmar also

ignores the testimony of Gert Høy, the LEO Pharma formulator who worked on the calcipotriol gel product, who said that he did not recall any testing being performed on the needle-shaped crystals.  (Tr. 666:6-17.)

Indeed, Tolmar's on-sale bar argument is premised entirely on an "assumption" Dr. Rasumssen made about the gel product that was "not proved."  (Tr. 74:14-24.)  In meeting minutes dated September 16, 1992, Dr. Rasmussen assumed that because needle-shaped crystals formed during a single milling experiment were calcipotriol monohydrate, the needle-shaped crystals in the gel must also have been calcipotriol monohydrate based on their shape alone.  (*See* DTX 13; Tr. 72:17-73:18, 74:13-75:5.)  But, "all [calcipotriol] gel preparations for use in clinical trials were produced *without* observing any conversion by milling."  (DTX 13 at LEOP0292244.)  In other words, the needles that were found in the gel in September 1992 were *not* created by milling.  (*See id.*)  Therefore, no conclusions can be made about the crystalline form of needle-shaped crystals found in LEO Pharma's gel based on the needle-shaped crystals analyzed in the milling experiment.  Moreover, even if a parallel could be drawn, aside from one single experiment, there is no evidence that milling produces needle-shaped calcipotriol monohydrate crystals on a regular basis.  (*See* DTX 87 at LEOP0292242; DTX 18 at LEOP0292247.)

Contrary to Tolmar's arguments, Dr. Rasmussen's trial testimony did not "confirm" that the gel product contained calcipotriol monohydrate.  (*See* Tolmar Br. pp. 23-25, 40.)  Instead, Dr. Rasmussen testified at trial that, "[w]e did never confirm that the needles in the gel [were] the monohydrate."  (Tr. 99:6-11.)  Dr. Rasumssen also testified that at the September 16 meeting, he "assumed at this point, at least based on this analysis of needles isolated from one [milling] experiment that these needles [in the gel] were monohydrate."  (Tr. 72:17-24.)

In addition, Tolmar's on-sale bar argument flatly contradicts the non-infringement case Tolmar has presented to this Court.  At trial, LEO Pharma's testing expert Dr. Fritz Blatter testified that he found needle-shaped crystals in Tolmar's ointment.  (Tr. 181:11-181:25.)  Dr. Blatter used sophisticated, state-of-the-art testing and analysis to identify those particular needle-shaped crystals as calcipotriol monohydrate.  (*See* Tr. 175:5-9, 182:7-14.)  In spite of this overwhelming evidence, Tolmar maintains that the needle-shaped crystals found in its ointment are not calcipotriol monohydrate due to various alleged "flaws" in Dr. Blatter's analysis.  (*See* Tolmar Br. at p.3 n.2.)  Yet, for purposes of the on-sale bar, Tolmar argues that this Court should assume, based on no testing evidence whatsoever, that (1) needle-shaped crystals were present in the gel formulations shipped to BMS, and (2) that those crystals were calcipotriol monohydrate. (*See* Tolmar Br. at 23-24, 39-40.)  Plainly, Tolmar must agree that a mere assumption is not clear and convincing evidence of the presence of calcipotriol monohydrate.

### 2. The June 15, 1992 Shipment Was Not a Commercial Offer for Sale of a Calcipotriol Monohydrate-Containing Product

Even if the gel shipped to BMS on June 15, 1992 did contain calcipotriol monohydrate, that shipment would not invalidate the '706 patent under § 102(b) because the shipment did not constitute a *commercial* offer for sale of calcipotriol monohydrate.  Dr. Poul Rasmussen's unrebutted trial testimony indicates that no consideration passed between LEO Pharma and BMS during the June 15, 1992 shipment of gel products.  (Tr. 65:12-66:3, 66:14-17, 108:6-109:5.)  Consequently, to establish that this transaction was a commercial offer for sale, Tolmar contends that the shipment was made pursuant to the product supply provisions of the 1989 LEO-BMS agreement.  However, the LEO-BMS agreement plainly does not cover calcipotriol-monohydrate containing products, which did not exist at the time the agreement was signed.  And even if calcipotriol monohydrate-containing products were covered, the June 15, 1992 shipment was

clearly made pursuant to the ***product development*** sections of the agreement for experimental

purposes, not the product supply provisions, which apply solely to FDA-approved products.

### a.   The LEO-BMS Agreement Does Not Cover Calcipotriol Monohydrate-Containing Products

Tolmar argues that the June 16, 1992 shipment to BMS was made pursuant to the supply

provisions of the LEO-BMS agreement and therefore constituted a commercial offer for sale.

However, the agreement could not have been a commercial offer for sale of the claimed

invention because it did not cover calcipotriol monohydrate, which was yet to be conceived

when the agreement was signed.  Nor, of course, had products containing calcipotriol

monohydrate been conceived of at that time.

As discussed above, § 102(b) requires "that the subject matter of the commercial offer for

sale be something within the scope of the claim."  *Tec Air, Inc. v. Denso Mfr. Mich. Inc.*, 192

F.3d 1353, 1359 (Fed. Cir. 1999) (internal citation omitted).  The LEO-BMS agreement covers

"Licensed Products" containing the "Compound" depicted in Appendix 2 to the agreement.

(DTX 20 at LEOP0411675.)  The figure in Appendix 2 indicates that the "Licensed Product(s)"

must contain calcipotriol anhydrate because the chemical formula and molecular weight given

for the covered "Compound" correspond to calcipotriol anhydrate, which lacks any water

molecules incorporated into the crystal structure.  (DTX 20 at LEOP0411705; *See* DTX 188 at

TOLM0000886; Tr. 553:4-19.)  A product containing calcipotriol monohydrate would not have

this chemical formula and molecular weight and, consequently, would not be covered by this

agreement.  (*See id.* at LEOP0411675.)  Thus, the supply provisions of the 1989 LEO-BMS

agreement are plainly not a commercial offer for sale of calcipotriol monohydrate because that

compound is not covered by the terms of the agreement.

Moreover, §102(b) also states that the claimed "invention" must be the subject of an offer for sale and Supreme Court has made clear that "invention" means "a concept that is complete." *Pfaff v Wells*, 525 U.S. 55, 66 (1998). Therefore, an invention cannot be "the subject of an offer for sale before it was even conceived. Such a result is illogical…. With no conception of an invention, there cannot be an offer for sale or a sale of that invention." *Sparton Corp. v. United States*, 399 F.3d 1321, 1324-25 (Fed. Cir. 2005). In *Sparton*, Sparton contracted with the Navy to supply it with devices described as having "multi-piece release plates." *Id.* at 1322. Soon after the contract, Sparton developed an improved version of the device with a "single-piece release plate." *Id.* Sparton filed for a patent on devices having the single-piece plate and eventually supplied single-piece plate devices to the Navy after the critical date pursuant to the original agreement. *Id.* The court held that the contract was not a commercial offer for sale of the patented device because the device had not been conceived at the time of the offer. *Id.* at 1324. Even assuming that the patented device was completed prior to the critical date and delivered pursuant to the contract after the critical date, these facts were irrelevant to the first *Pfaff* prong—the contract was still not a commercial offer for sale of the claimed invention. *Id.*

Here, the LEO-BMS agreement was signed in 1989, almost two years before Erik Hansen performed his experiment to obtain larger calcipotriol crystals that surprisingly produced calcipotriol monohydrate. (*See* DTX 20 at LEOP0411703; PTX 98 at LEOP0225944; Tr. 114:1-116:25.) As such, calcipotriol monohydrate and, by extension, formulations containing it had not been conceived at the time of the agreement. The agreement does not mention calcipotriol monohydrate and describes calcipotriol anhydrate as the covered Compound. Consequently, the 1989 LEO-BMS agreement could not have been a commercial offer for sale of calcipotriol monohydrate or pharmaceutical compositions containing it because that substance had not been

conceived at that time.  *See Sparton*, 399 F.3d at 1324; *see also Tec Air*, 192 F.3d at 1358-59

(upholding a jury verdict of no "on-sale" bar where pre-critical date offers did not specify the

balancing plugs to be included on the fans to be sold and the patentee/offeror did not intend to

use the patented plugs at the time it made the offers).

In addition, the "licensed products" which were to be commercially supplied and paid for

were limited to FDA approved products.  As explained above, the only money paid to LEO

Pharma prior to FDA approval of the products was milestone payments for filing applications

with the FDA and obtaining approval of those applications.  *See supra* Section II.C.1.  The offers

to commercially supply and purchase products, and the actual supply and purchase of products,

were limited to those products for which FDA approval was actually obtained.  (DTX 20 at

LEOP0411677-80.)  The gel product failed during testing and no FDA approval was ever

obtained, thus it is not covered by the supply and purchase terms of the BMS agreement.

> **b.      The Gel Product Shipped to BMS on June 15, 1992
> Was Shipped for Experimental Purposes Pursuant
> to the Development Portions of the Agreement**

Tolmar contends that even though the LEO-BMS agreement does not mention

calcipotriol monohydrate at all, the June 15, 1992 shipment of calcipotriol gel to BMS was made

"pursuant to" the supply provisions of the agreement and was a commercial offer for sale of

calcipotriol monohydrate.  But the evidence plainly demonstrates that the gel products were

shipped pursuant to the development portions of the agreement and that the shipment constitutes

a permissible experimental use that does not trigger the 102(b) on-sale bar.

For an activity to constitute an on-sale bar, it must be a sale primarily for profit rather

than experimental purposes.  *Keystone Retaining Wall Sys. V. Westrock, Inc.*, 997 F.2d 1444,

1451-52 (Fed. Cir. 1993).  The United States Supreme Court has opined that:

> "[A]n inventor who seeks to perfect his discovery may conduct extensive testing without losing his right to obtain a patent for his invention—even if such testing occurs in the public eye. The law has long recognized the distinction between inventions put to experimental use and products sold commercially.

*Pfaff,* 525 U.S. at 64 (citing *City of Elizabeth v. Am. Nicholson Pavement Co.*, 97 U.S. 126 (1877)). If the activity represents an effort to perfect the invention or to ascertain whether it will work for its intended purpose, it is a permissible experimental use and not a 102(b) on-sale bar. *Id.*

The LEO-BMS agreement makes clear on its very first page that it is a dual-purpose agreement that contemplates development activities as well as the future marketing of products. (DTX 20 at LEOP0411674.) It plainly states that development products will be provided free of charge while products supplied for marketing will be provided at a specified cost, namely, 23% of BMS's net sales price with several applicable qualifications. (*Id.* at LEOP0411680.) Dr. Rasmussen unequivocally testified that BMS did not pay for the gel samples sent on June 15, 1992, or any samples sent during the development collaboration agreement. (Tr. 65:12-66:3; 108:6-109:5.) The invoice accompanying the gel samples stated a dollar value for customs and tax purposes only; no money changed hands between LEO Pharma and BMS. (DTX 250; Tr. 65:12-66:3, 66:14-17, 108:6-109:5.) Tolmar has not presented any evidence to the contrary to show that BMS paid the price specified in the supply provisions for the gel products. Consequently, it is clear that the gel samples were sent "free of charge" to "enable [BMS] to conduct…development work." (*See* DTX 20 at LEOP0411686.)

Other facts surrounding the provision of samples to BMS support LEO Pharma's contention that the samples were provided for experimental purposes only, not for profit. At the time the samples were shipped, LEO Pharma did not have FDA approval to sell gel products in the U.S. and clinical trials with the gel formulation had not yet taken place. (DTX 18 at

LEOP0292247.)  LEO Pharma sent the gel samples to BMS for use in a six-month course of

"challenge tests" to determine which of four possible preservative systems to use in the final gel

formulation.  (DTX 18 at LEOP0292248; DTX 20 at LEOP0411711)  LEO Pharma also

contemplated that BMS would perform human dermal safety studies, clinical trials, and a host of

other development tasks with the gel in the future.  (DTX 18 at LEOP0292248; DTX 20 at

LEOP0411711).  The preservative challenge testing was still not completed on October 7, 1992,

several months *after* the allegedly anticipating "sale."  (*Id.*)

Moreover, calcipotriol monohydrate was not in any FDA approved products in June 1992

so it could not have been commercially sold in the United States at that time.  (Tr. 66:8-11.)

According to Gert Høy, the gel was ***never*** commercialized or produced in commercial batch

sizes because "it didn't show good enough efficacy."  (Tr. 665:17-24.)  The batches of

calcipotriol gel that were produced would have only been used for product development

purposes.  (*Id.*)  "A terminated development project that never bore commercial fruit and was

cloaked in confidentiality" is not an on-sale bar.  *Continental Can Co., USA v. Monsanto Co.*,

948 F.2d 1264, 1270 (Fed. Cir. 1991).  Hence, the shipment of gel to BMS on June 15, 1992 was

clearly for experimental product development purposes and was not a commercial offer for sale.

The *Enzo Biochem, Inc. v. Gen-Probe, Inc.* case cited by Tolmar is distinguishable from

the case at hand for several reasons.  424 F.3d 1276 (Fed. Cir. 2005).  In *Enzo*, the parties had

executed an amendment to their agreement that made it clear that the claimed invention was

covered as a part of that agreement.  *Id.* at 1279.  Here, there was no such amendment that made

it clear that the supply provision required LEO Pharma to sell calcipotriol monohydrate gel to

BMS for a profit.  Also, the research and development portion of the *Enzo* agreement did not

state that any samples would be provided free of charge, but rather required payment for these

samples.  *Id.* at 1279.  Here, it is not at all clear that calcipotriol monohydrate is covered by the

agreement, to establish a commercial offer for sale, Tolmar must rely upon a shipment of a

product that allegedly contains calcipotriol monohydrate pursuant to an agreement that does not

mention that substance.  Unlike the defendant in *Enzo*, Tolmar cannot establish that the

agreement required LEO Pharma to sell calcipotriol monohydrate to BMS prior to the critical

date.

**c.      The Licensing Provisions of the LEO-BMS
Agreement Are Also Not a Commercial Offer
for Sale of Calcipotriol Monohydrate**

In its Brief, Tolmar also discusses portions of the LEO-BMS agreement concerning the

licensing of patents to BMS.  (*See* Tolmar Br. SOF ¶¶ 60-62.)  Tolmar notes that (1) LEO

Pharma licensed BMS the rights to the Calverley patent, (2) BMS agreed to pay LEO Pharma

royalties in consideration of the patent license, and (3) BMS agreed to make a series of other

product development milestone payments in consideration of the rights granted.  (*Id*; DTX 20 at

LEOP0411677-79, 704.)  But the law is clear that "merely granting a license to an invention,

without more, does not trigger the on-sale bar of § 102(b)."  *In re Kollar*, 286 F.3d 1326, 1330-

31 (Fed. Cir. 2002) (citing *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1217 (Fed. Cir.

1998).  In *Kollar*, the Federal Circuit held that a license agreement where the parties agreed to

share technology and coordinate research efforts with the goal of obtaining regulatory approval

to build a commercial plant capable of implementing a claimed process was not a commercial

offer for sale.  *Id.* at 1328-31.  Here, LEO Pharma similarly granted patent rights to BMS and the

parties agreed to jointly conduct development work with the goal of obtaining FDA approval of

calcipotriol products.  (*See* DTX 20 at LEOP0411677-679.)  Consequently, the licensing

portions of the LEO-BMS agreement discussed in Tolmar's brief do not give rise to a § 102(b)

on-sale bar.

In any event, the licensing provisions cannot constitute an on-sale bar because they do not cover calcipotriol monohydrate and the '706 patent.  The agreement defines the licensed patents as:

> [T]he patent application owned and controlled by LEO and listed in Appendix 1 hereto, together with any divisions, continuations, and continuations-in-part, thereof and all patent issuing thereon, including reissues, patents of addition and any registration or confirmation patents, which in the absence of a license, would be infringed by the manufacture, use or sale of Licensed Product(s) as defined below.

(DTX 20 at LEOP0411675.)  The application in Appendix 1 is the U.S. application that issued as the Calverley patent on the calcipotriol molecule.  (*Id.* at LEOP0411704; DTX 2.) The '706 patent is not related in any way to the Calverley patent. Appendix 2 to the agreement indicates that the "Licensed Product(s)" must contain calcipotriol anhydrate because the chemical formula and molecular weight given for the covered compound correspond to calcipotriol anhydrate, which lacks any water molecules incorporated into the crystal structure.  (DTX 20 at LEOP0411705.)  These "Licensed Product(s)" containing only calcipotriol anhydrate would not infringe the '706 patent, as required for the patent to be covered by the agreement.  (*See id.* at LEOP0411675.)  Thus, even if the licensing portions of the agreement could be a commercial offer for sale, these provisions are not a commercial offer for sale of calcipotriol monohydrate.

### 3.    The Invention Was Not Ready For Patenting Before the Critical Date

Even if a commercial offer for sale took place prior to January 7,1993, the on-sale bar still does not apply.  For an invention to be "on-sale" under § 102(b), the invention must be "ready for patenting" prior to the critical date.  *Pfaff*, 525 U.S. at 67-68.  If an invention has been reduced to practice prior to the critical date, it is "ready for patenting."  *Id.*  The only evidence Tolmar offers to demonstrate that the "ready for patenting" prong is met is that:

> Plaintiff reduced to practice calcipotriol gel products and shipped
> these products to BMS prior to January 7, 1993.  Plaintiff
> determined that the calcipotriol it delivered to BMS in these gel
> products "exclusively contains crystalline monohydrate."

(Tolmar Br. at 40-41.)  As discussed at length above, Tolmar's allegations are not supported by

the facts.  There is no evidence, much less clear and convincing evidence, that the gel

formulations shipped to BMS (or any LEO Pharma gel formulation) contained calcipotriol

monohydrate.  Therefore, for the same reasons Tolmar cannot prove by clear and convincing

evidence that the claimed invention was offered for sale, it also cannot prove that the invention

was ready for patenting as of the critical date.

### C.   Claims 2 and 12 Would Not Have Been Obvious to a Person of Ordinary Skill in the Art

Claim 2 of the '706 patent is directed to pharmaceutical compositions containing

calcipotriol monohydrate and Claim 12 is directed specifically to compositions in the form of an

ointment.  Tolmar contends, without any supporting expert testimony or other evidence, that

Claims 2 and 12 of the '706 patent are obvious under 35 U.S.C. § 103 in view of the Larsen

Publication or the calcipotriol gel product that was allegedly "on sale" prior to the '706 patent's

critical date.  Section 103 provides that:

> A patent may not be obtained though the invention is not
> identically disclosed or described as set forth in section 102 of this
> title [relating to anticipation], if the differences between the subject
> matter sought to be patented and the prior art are such that the
> subject matter as a whole would have been obvious at the time the
> invention was made to a person of ordinary skill in the art to which
> said subject matter pertains…

35 U.S.C. § 103(a).  As Tolmar's line of argument implicitly concedes, even if the Larsen

Publication is § 102(a) prior art, it does not disclose any pharmaceutical compositions containing

calcipotriol monohydrate as required by Claims 2 and 12 and therefore cannot anticipate these

claims.  And, even if a calcipotriol monohydrate-containing *gel* product were "on sale" prior to

the critical date, that sale cannot anticipate claim 12 because no ***ointment*** product was on sale, as

required by that claim.  Consequently, Tolmar turns to § 103 to attempt to invalidate these

dependent claims.

But Tolmar has presented no evidence, let alone clear and convincing evidence,

demonstrating that Claims 2 and 12 would have been obvious to a person of ordinary skill in the

art.  Tolmar argues that the pharmaceutical compositions of Claims 2 and 12 were "well known

in the art," pointing to formulations containing calcipotriol anhydrate disclosed in the Calverley

patent.  (Tolmar Br. at p. 41, 43.)  Tolmar then posits, without citing any supporting evidence or

authority, that:

> [A] person of skill in the art, armed with the prior art calcipotriol
> monohydrate disclosed in the Larsen Publication or used in
> Plaintiff's calcipotriol gel product sold to BMS, would have been
> motivated to pursue the "known options" of using calcipotriol
> monohydrate in a pharmaceutical composition (e.g., the
> formulations disclosed in the Calverley Patent) as called for by
> claim 2 generally, and more specifically, in an ointment called for
> by Claim 12."

(Tolmar Br. at p. 43.)  However, the Calverley patent discloses only the calcipotriol molecule

and does not disclose or even suggest the existence of a monohydrate form of calcipotriol.  (*See*

DTX 2, Compound 59, Example 5.)  The patent discloses pharmaceutical compositions

containing calcipotriol, but contains no information about whether those compositions would be

compatible with a monohydrate form of calcipotriol.  (*See* DTX 2.)  Tolmar offers no evidence,

aside from the unsupported assertions of its counsel, that it would have been obvious to a person

of ordinary skill in the art that calcipotriol monohydrate could be used in place of calcipotriol

anhydrate in the pharmaceutical compositions known at that time.  Tolmar declined to put its

expert witnesses on this issue on the stand at trial.

Tolmar also relies heavily upon testimony given by Dr. Rasmussen that allegedly establishes that the limitations of Claims 2 and 12 "were not inventive." (Tolmar Br. at 42-43.) However, a witness not qualified as an expert under Fed. R. Evid. 702 may not testify concerning "obviousness, or any of the underlying technical questions, such as…the differences between the claimed invention and the prior art, or the motivation of one of ordinary skill in the art to combine these references to achieve the claimed invention." *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1363 (Fed. Cir. 2008). Contrary to Tolmar's argument, Dr. Rasmussen's alleged status as a person of ordinary skill in the art does not automatically entitle him to testify concerning the legal issue of obviousness. *See id.* Indeed, at trial, this Court properly sustained LEO Pharma's objection to this line of questioning on the grounds that it called for a legal conclusion and was improper expert testimony. (Tr. 79:5-80:1.)

Nonetheless, even if admitted and credited, Dr. Rasmussen's testimony at best establishes that, apart from the inclusion of calcipotriol monohydrate, the formulations disclosed in the '706 patent were previously known in the art, i.e., the inventors of the '706 patent did not independently develop those formulations themselves. Dr. Rasmussen testified:

> Q.  Now, prior to the filing date of the '706 patent, it was well-known to put calcipotriol in a pharmaceutical composition; is that correct?
>
> A.  Yes. ***The forms of calcipotriol which were known at the time***, yes.
>
> ***
>
> Q.  And it was well-known again before the filing date of the '706 patent to use calcipotriol in an ointment; is that correct?
>
> A.  It was known to [use] calcipotriol ***in solution*** in an ointment.
>
> ***
>
> A.  It was ***not known to use it as a suspension***.

(Tr. 80:16-20, 81:1-5, 7, emphasis added.)  Clearly Dr. Rasmussen's testimony says nothing about whether it would have been obvious to a person of ordinary skill in the art that calcipotriol monohydrate could have successfully been substituted for calcipotriol anhydrate or calcipotriol dissolved in solution in the pharmaceutical compositions known at that time.  Even if accepted, Dr. Rasmussen's testimony cannot cure Tolmar's complete failure to present any evidence that Claims 2 and 12 are obvious in view of the prior art.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, LEO Pharma respectfully requests that this Court find that Claims 1 and 2 of the '706 patent are not invalid as anticipated under 35 U.S.C. § 102.  LEO Pharma also respectfully requests that this court find that Claims 2 and 12 of the '706 patent are not invalid as obvious under 35 U.S.C. § 103.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

_____

Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com

*Attorneys for Plaintiff LEO Pharma A/S*

OF COUNSEL:

William E. Solander
Bruce C. Haas
FITZPATRICK, CELLA, HARPER & SCINTO
1290 Avenue of the Americas
New York, NY  10104
(212) 218-2100

August 20, 2012

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2012, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on August 20, 2012, upon the following in the manner indicated:

Adam Poff, Esquire                                         *VIA ELECTRONIC MAIL*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Tolmar, Inc.*

Jeffrey R. Gargano, Esquire                                *VIA ELECTRONIC MAIL*
Brent A. Hawkins, Esquire
Krista Vink Venegas, Esquire
Wan-Shon Lo, Esquire
MCDERMOTT WILL & EMERY LLP
227 West Monroe Street, Suite 4400
Chicago, IL  60606
*Attorneys for Tolmar, Inc.*

David H. Dolkas, Esquire                                   *VIA ELECTRONIC MAIL*
David L. Larson, Esquire
MCDERMOTT WILL & EMERY LLP
275 Middlefield Road
Suite 100
Menlo Park, CA  94025
*Attorneys for Tolmar, Inc.*

Mandy H. Kim, Esquire                                      *VIA ELECTRONIC MAIL*
MCDERMOTT WILL & EMERY LLP
18191 Von Karman Avenue
Suite 500
Irvine, CA  92612-7108
*Attorneys for Tolmar, Inc.*

/s/ *Jack B. Blumenfeld*

_____

Jack B. Blumenfeld (#1014)